# 14-0182-cv

# United States Court of Appeals

## for the

## Second Circuit

GLORIA COOTS BALDWIN, PATRICIA BERGDAHL,
CHRISTINE PALMITESSA, Individuals,

*Plaintiffs-Appellants,*

– v. –

EMI FEIST CATALOG, INC., a New York corporation,

*Defendant-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLEE

DONALD S. ZAKARIN
FRANK P. SCIBILIA
ROSS M. BAGLEY
PRYOR CASHMAN LLP
*Attorneys for Defendant-Appellee*
7 Times Square
New York, New York 10036
(212) 421-4100

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendant-Appellee EMI Feist Catalog, Inc. represents that it is a partially-owned indirect subsidiary of Sony Corporation, a publicly traded company organized under the laws of Japan.  No publicly traded company other than Sony Corporation owns more than 10% of the stock of EMI Feist Catalog, Inc.

Dated: New York, New York
       August 7, 2014

PRYOR CASHMAN LLP

By:   */s/ Donald S. Zakarin*
      Donald S. Zakarin
      dzakarin@pryorcashman.com
      Frank P. Scibilia
      fscibilia@pryorcashman.com
      Ross M. Bagley
      rbagley@pryorcashman.com
7 Times Square
New York, New York 10036-6569
(212) 421-4100

*Attorneys for Defendant-Appellee*
*EMI Feist Catalog, Inc.*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ........................................................................1

STATEMENT OF THE ISSUES.....................................................9

STATEMENT OF THE CASE.......................................................10

   I.   Facts Relevant To The Issues Submitted For Review ....................10

      A. The Song, 1934 Agreement And 1951 Renewal Agreement ...................10

      B. Congress Extends The Copyright Renewal Term .....................................10

      C. The 1981 Exercise Of Coots' Termination
         Right And The 1981 Agreement For The ERT .........................................12

      D. The 1981 Notice Is Not Recorded .............................................................16

      E. The 2004 304(d) Notice Purporting
         To Terminate The 1951 Agreement ...........................................................17

      F. Appellants' 2007 Section 203 Notice And
         Confirmation That The 1981 Agreement
         Applied Only To The ERT Commencing In 1990 ...................................19

      G. Appellants' 2012 Section 203 Notice .......................................................20

   II.  Relevant Procedural History ........................................................20

      A. The Florida Action And Appellants' Admissions Therein........................20

      B. The Amended Florida Complaint .............................................................22

      C. Appellants' Action In The Southern District Of New York......................23

      D. EMI's Motion For Summary Judgment.....................................................24

E. Appellants' Motion For Summary
Judgment And Opposition To EMI's Motion............................................25

III. The Disposition Below .................................................................................27

SUMMARY OF THE ARGUMENT .....................................................................30

ARGUMENT ...........................................................................................................32

I. THE DISTRICT COURT'S HOLDING THAT
THE 1951 AGREEMENT WAS NEVER TERMINATED
AND CANNOT BE TERMINATED IS CORRECT ...................................32

A. Coots Failed To Effect Termination Of The 1951 Agreement..............32

B. The 1981 Agreement Did Not, "As A Matter of
Contract Interpretation," Terminate The 1951 Agreement....................33

C. The 1981 Agreement Did Not,
"By Its Nature," Terminate the 1951 Agreement ...................................40

D. Appellants' Contention That The 1981 Agreement Either
Intended To Or Did Terminate The 1951 Agreement
Is Refuted By Uncontradicted Evidence And Admissions.....................46

E. The 2004 Notice Did Not And
Could Not Terminate The 1951 Agreement ...........................................48

II. APPELLANTS CANNOT TERMINATE
THEIR OWN GRANTS IN THE 1981 AGREEMENT..............................52

III. THE 2007 NOTICE IS PREMATURE, VOID AND DEFECTIVE...........55

CONCLUSION ...................................................................................................56

# <u>TABLE OF AUTHORITIES</u>

## <u>CASES</u>

<u>PAGE(s)</u>

<u>Bakalar v. Vavra</u>,
    619 F.3d 136 (2d Cir. 2010) ........................................................................ 48

<u>Barbour v. City of White Plains</u>,
    700 F.3d 631 (2d Cir. 2012) .......................................................................... 8

<u>Classic Media, Inc. v. Mewborn</u>,
    532 F.3d 978 (9th Cir. 2008) .................................................... 38, 44, 45, 45

<u>Connecticut Nat'l Bank v. Germain</u>,
    503 U.S. 249 (1992) .................................................................................... 51

<u>Jaggernauth v. United States AG</u>,
    432 F.3d 1346 (11th Cir. 2005) ............................................................ 50, 51

<u>Kim v. Columbia Univ.</u>,
    487 F. App'x 600 (2d Cir. 2012) .................................................................. 8

<u>Lowery v. Alabama Power Co.</u>,
    483 F.3d 1184 (11th Cir. 2007) .................................................................. 51

<u>Milne v. Stephen Slesinger, Inc.</u>,
    430 F.3d 1036 (9th Cir. 2005) .............................................................*passim*

<u>In re Nortel Networks Corp. Sec. Litig.</u>,
    539 F.3d 129 (2d Cir. 2008) ....................................................................... 49

<u>Penguin Group (USA) Inc. v. Steinbeck</u>,
    537 F.3d 193 (2d Cir. 2008) .................................................... 44, 45, 53, 55

<u>Poplar Lane Farm LLC v. Fathers of Our Lady of Mercy</u>,
    449 F. App'x 57 (2d Cir. 2011) .................................................................. 49

<u>Tasini v. New York Times Co.</u>,
    206 F.3d 161 (2d Cir. 1999) ....................................................................... 51

<u>United States v. McKeon</u>,
    738 F.2d 26 (2d Cir. 1984) ....................................................................47, 48

## <u>STATUTES</u>

Fed R. Civ. P. 12(b)(2) ................................................................23

Fed R. Civ. P. 12(b)(6) .............................................................22, 23

Fed R. Civ. P. 56(c) ....................................................................25

H.R. Rep. No. 94-1476 at 125 (1976) .................................................11, 53

Local Rule 56.1 ..........................................................................25

17 U.S.C. § 203 ........................................................................*passim*
    § 203(a) .......................................................................17, 26, 53
    § 203(a)(3) ...............................................................17, 24, 26, 56
    § 203(a)(4)(A) ......................................................................17
    § 304 ........................................................................*passim*
    § 304(a) .............................................................................11
    § 304(c) ......................................................................*passim*
    § 304(c)(2) ..........................................................................24
    § 304(c)(4)(A) ..............................................................*passim*
    § 304(c)(6) ..........................................................................32
    § 304(c)(6)(D) ..............................................................*passim*
    § 304(c)(6)(F) ..............................................................*passim*
    § 304(d) ......................................................................*passim*

## <u>TREATISE</u>

3 Melville B. Nimmer & David Nimmer,
    *Nimmer on Copyright* 11.06[B] (Rev. Ed.) ..........................................32, 33

**INTRODUCTION**

The facts on this appeal are simple and undisputed. The U.S. District Court for the Southern District of New York (Scheindlin, U.S.D.J.) (the "Court") granted summary judgment holding that a 1951 agreement (the "1951 Agreement") between Appellee EMI Feist Catalog, Inc. ("EMI")[1] and J. Fred Coots ("Coots") respecting the song "Santa Claus Is Comin' To Town" (the "Song") had not been terminated and, consistent with Section 304(c) of the U.S. Copyright Act (the "Act"), could never be terminated. (SPA.1-27.)[2]

The case below was Appellants' third attempt to manufacture a basis for terminating EMI's rights. Appellants first sued in the Southern District of Florida, claiming that the 1951 Agreement had never been terminated until they effected termination in 2009 pursuant to a 2004 Notice of Termination under Section 304(d) of the Act (the "2004 Notice").[3] EMI moved to dismiss, pointing out that Coots

---

[1]   Defendant-Appellee EMI Feist Catalog, Inc., and all of its predecessors-in-interest, including Leo Feist Inc. ("Feist"), Robbins Music Corporation ("Robbins"), and United Artists Corporation ("UA") will be referred to herein, individually and collectively as "Appellee" or "EMI." It is undisputed that EMI Feist Catalog, Inc. is successor-in-interest to Feist, Robbins and UA.

[2]   All references to exhibits in the Appendix will be preceded by "A.__." All references to the Special Appendix will be preceded by "SPA.__." All references to Appellants' opening brief on appeal will be preceded by "Opening Br. at __."

[3]   As shown below, this claim has resurfaced in Appellants' brief, despite the fact that it was not pleaded below, was not argued by Appellants below and was jettisoned following EMI's motion to dismiss Appellants' original Florida complaint.

exercised a Section 304(c) right of termination in 1981 by serving a termination notice ("1981 Notice"), even though, as Appellants admitted, he had never effected termination because he had failed to record the 1981 Notice. The 1981 exercise of a termination right under Section 304(c) barred any Section 304(d) termination right. In response, Appellants amended their complaint, abandoning their insistence that the 1951 Agreement survived a 1981 Agreement (the "1981 Agreement"), claiming instead the right to terminate the 1981 Agreement under Section 203.

Because termination of the 1951 Agreement had never been effected under Section 304(c) (as Appellants' original complaint admitted) and the Act barred termination of the 1951 Agreement, Appellants had to find some other way of eliminating the 1951 Agreement. Thus, they invented the argument that the 1981 Agreement itself terminated the 1951 Agreement (the "immediate termination" argument).[4] This argument, which is refuted by the plain terms of the 1981 Agreement and applicable law, was also the foundation for Appellants' complaint in the Court below (based exclusively on the supposed expert opinion of Lisa

---

[4] EMI also moved to dismiss Appellants' amended complaint in the Florida action on the merits and based on lack of personal jurisdiction. The Court dismissed for lack of personal jurisdiction.

Alter).[5]  With Ms. Alter excluded (as an "expert" offering only  legal conclusions), Appellants' immediate termination argument now exists in thin air.

The key facts and key documents in this case are few in number and undisputed.  First, Coots never recorded the 1981 Notice (despite representing in the 1981 Agreement that it had been recorded).  The Act requires a termination notice to be recorded in the Copyright Office before the effective date of termination, "as a condition to it taking effect."  *See* 17 U.S.C. § 304(c)(4)(A).  Second, as the Court found, the 1981 Agreement was not intended to and did not terminate the 1951 Agreement.  (SPA.18-24.)  Rather, the 1981 Agreement, by its express terms, was intended to insure that EMI's rights would continue during the extended renewal term of copyright ("ERT") commencing upon the effective date of the 1981 Notice in 1990 (assuming compliance with the recordation requirements of the Act).

Thus, as the Court held, the 1951 Agreement was never terminated and remains in effect until 2029.  (SPA.19.)  Appellants' appeal therefore depends on their finding some way to eliminate the 1951 Agreement.  It is precisely this need that accounts for all of the immaterial and extraneous "factual" assertions and legally baseless arguments littering Appellants' papers.

---

[5] The Court excluded Ms. Alter's opinion as "legal conclusions" and rejected her "de facto" termination theory.  (SPA.13-16, 19-24.)  As shown below, while Ms. Alter is gone, her legally baseless "de facto" termination theory lives on in Appellants' brief.

Appellants argue that the 1981 Agreement "by its nature" terminated the 1951 Agreement. According to Appellants, the terms of the 1981 Agreement should be ignored because *any* agreement "made pursuant to Section 304(c)(6)(D)" somehow *automatically* terminates the prior agreement, regardless of the terms of such agreement.

Section 304(c)(6)(D) nowhere states or even suggests that any agreement made with the original grantee prior to the effective date provided in a notice of termination automatically terminates the original grant. Such contention flies in the face of Section 304(c)(6)(F), which expressly states – without Appellants' self-created exception – that unless the notice is recorded, the prior grant continues in effect. Consistent with New York contract law, every case addressing the Section 304 termination right holds that, absent compliance with the requirements of Section 304, the new grant must expressly terminate the prior grant. Here, as the Court found, the new grant does anything but terminate the prior grant. (SPA.20.)

Appellants also argue that "common sense alone establishes the district court's error" because, if the 1981 Agreement did not immediately terminate the 1951 Agreement, then both grants would be operative and that cannot be the case. (Opening Br. at 47.) The sole support for this argument below was Ms. Alter. (SPA.14.) The contention here lacks even her support.

Even the contracts here refute Appellants' argument. Appellants admit that a 1934 Agreement granting the original copyright term co-existed with the 1951 Agreement until commencement of the renewal term in 1962.[6] So too did the 1951 Agreement and 1981 Agreement co-exist. The 1981 Agreement "insured" that EMI would retain the ERT that would revert to Coots in 1990, assuming the 1981 Notice were recorded. Until 1990, the 1951 Agreement continued in effect, covering the 28 year renewal term (to which the 1981 Agreement was wholly inapplicable). Because the 1981 Notice was not recorded, the termination of the 1951 Agreement was never effected (and the ERT rights never reverted to Coots). Pursuant to Section 304(c)(6)(F), it continues until expiration of copyright in 2029.

Appellants ignore the plain language of the 1981 Agreement (and invent their specious immediate termination argument) because the 1981 Agreement very clearly did not terminate the 1951 Agreement "upon execution." As the Court concluded, "[n]othing in the 1981 Agreement suggests that the parties intended it to immediately supercede the earlier [1951] Agreement" (SPA.20), and to terminate an agreement under New York contract law requires the parties to have "clearly expressed their intention" to do so. (*Id.* at 22.) The 1981 Agreement applied solely to the ERT and did not even provide for any royalty payments until the commencement of the ERT in 1990. (*Id.*)

---

[6] In fact, the 1934 Agreement continues to exist for the World ex-U.S, despite the existence of the 1951 and 1981 Agreements.

Ignoring that they made no such argument below and made no such claim in their complaint (and ignoring also that it completely contradicts their immediate termination argument), Appellants also claim that they terminated the 1951 Agreement pursuant to the 2004 Notice. The 2004 Notice was a nullity. Section 304(d) provides no right of termination where the 304(c) right has previously been exercised, as it was here in 1981. (SPA.24-25.)

Finally, presuming that they have disposed of the inconvenient 1951 Agreement, Appellants argue that their Section 203 notice of termination served in 2009 terminates the 1981 Agreement in 2016 or, failing that, that their Section 203 notice of termination served in 2012 terminates the 1981 Agreement in 2021. The Court did not reach these arguments because it found the 1951 Agreement extant. To the extent that this Court should reach this issue, because Appellants (Coots' heirs) made their own express grants in the 1981 Agreement, they have no termination right under Section 203, which permits only the termination of grants made by authors, not grants made by heirs (and if they had such right, the earliest termination would be in 2021).

Appellants accuse EMI's counsel of cynical litigation arguments. Yet the Court found that the "remarkably cynical theory" (Opening Br. at 5) – that the 1951 Agreement cannot be terminated – was exactly correct in accordance with Section 304(c)(6)(F) of the Act.

Desperate to manufacture some factual issue in a case where the facts and documents are few in number and undisputed, Appellants misrepresent irrelevant "facts" and invoke supposed "intent."  Appellants assert that "[a]ll of the numerous records from [Appellee's] computer system consistently list the 1981 Grant as the sole operative grant."  (*Id.* at 15.)  Not only is this false, it also ignores that until Appellants commenced the Florida Action in 2011, EMI did not know Appellants failed to record the 1981 Notice with the Copyright Office and assumed that the 1981 Agreement applied to the ERT.[7]

Appellants also argue that EMI's 2007 proposal to pay Appellants $2.75 million is somehow relevant.  In fact, it simply shows that EMI employees did not understand the termination provisions of the Act (and were unaware that the 1981 Notice had never been recorded).  Appellants' ill-advised rejection of the proposal shows their own lack of understanding.  (A.311.)  The Act and the plain terms of the 1981 Agreement are not changed by whatever misunderstanding of the law and the facts are reflected by the $2.75 million proposal and its rejection.

Similarly, Appellants' arguments about "intent" are irrelevant because, as the Court found, the language of the 1981 Agreement is unambiguous.  But if

---

[7]  Appellants cite A.466-475.  A.466 and A.471 state that the Song "is subject to the following agreements:  9/5/34 SSA [single song agreement] between EMI FEIST and Gillespie & Coots which granted world rights but did not include renewals. *12/3/51 Renewal Agreement covering J. Fred Coots' interest*. . . . 12/15/81 ERT Agreement with Coots and his heirs."

"intent" were relevant, the undisputed evidence of the parties' intent at the time they entered into the 1981 Agreement also refutes Appellants' "immediate termination" argument. Gloria Coots Baldwin and Coots' attorney William Krasilovsky, the only remaining percipient witnesses, testified that the intent of the 1981 Agreement was *not* to immediately terminate the 1951 Agreement, but to instead grant the rights in the extended renewal term copyright in the Song *commencing in 1990*. (SPA.23-24.)

Finally, Appellants ask this Court to just ignore the law and the facts and make policy (to benefit Appellants). They argue that the reason for the elimination of the split-term copyright structure of the 1909 Act was to abolish *Fisher Music Co. v. M. Witmark  Sons*, and to "solve the age-old problems of unequal bargaining power and uncertain valuation" (Opening Br. at 31-32), an argument that is incomplete, inaccurate and irrelevant. This is actually a case where the termination regime of Section 304(c) operated exactly as Congress intended. Having exercised the termination right, Coots entered into the 1981 Agreement granting the ERT and obtaining a payment of $100,000 for Appellants.

Appellants' problem is that Coots failed to record the 1981 Notice, thereby never effecting termination of the 1951 Agreement. Having exercised a 304(c) right of termination, Appellants have no Section 304(d) termination right. Because the 1951 Agreement is a pre-1978 Agreement, there is no right to terminate it

under Section 203.  Because the 1951 Agreement also cannot be terminated under Section 304, in accordance with 304(c)(6)(F), EMI's rights continue until 2029.

## STATEMENT OF THE ISSUES

1.      Where the 1981 Agreement nowhere terminated the 1951 Agreement and instead stated it was intended to "insure" that EMI would have all rights in the Song for the ERT commencing in 1990 and provided that the terms of the 1951 Agreement would continue until termination was effected in accordance with the Act, did the Court correctly hold that the 1951 Agreement was not terminated by the 1981 Agreement?

2.      Where Appellants did not argue below and their complaint did not claim that the 1951 Agreement was terminated under 304(d) by the service and recordation of the 2004 Notice, did the Court correctly hold that there is no Section 304(d) right of termination where a Section 304(c) right of termination has been exercised?

3.      Assuming *arguendo* that the 1951 Agreement had somehow ceased to exist, was the 1981 Agreement terminable by Appellants under Section 203 where Section 203 precludes termination of grants made by anyone other than the author?

4.      Assuming *arguendo* that the 1951 Agreement had somehow ceased to exist and further assuming *arguendo* that the 1981 Agreement were also terminable by Appellants under Section 203, is the 1981 Agreement terminable under Section

9

203 prior to 2021 (the earlier of 40 years after the date of the 1981 Agreement or 35 years after 1990 – the earliest publication date under the terms of the 1981 Agreement)?

## STATEMENT OF THE CASE

I. **Facts Relevant To The Issues Submitted For Review.**

    A. **The Song, 1934 Agreement And 1951 Renewal Agreement.**

In 1934, Coots and Haven Gillespie co-authored the Song (SPA.2) and conveyed the worldwide copyright ownership in the Song to Feist which registered the Song in the Copyright Office under Feist's name. (A.40-41, 43-44; SPA.2.) Under the 1909 U.S. Copyright Act, the Song had an initial 28-year term, plus a 28 year "renewal" term to commence in 1962, before its copyright would expire. (SPA.2-3.)

In the 1951 Agreement, Coots granted Feist "all renewals and extensions" of all copyrights in the Song, "everywhere and forever," "throughout the world." (A.46-49.) In 1962, Feist renewed its copyright and continued its ownership of the Song. (A.51-52; SPA.3.) It is undisputed that the 1951 Agreement did not immediately replace or supersede the 1934 Agreement. (A.18 ¶¶ 19-21.)

    B. **Congress Extends The Copyright Renewal Term.**

The Act replaced the 1909 Act effective January 1, 1978. It provided for an extended renewal term of 19 years (increasing the term of existing U.S. copyrights

from 56 to 75 years) for published works in either their initial or renewal term prior to January 1, 1978.  (A.184 ¶ 9; SPA.11.)  The Act also provided authors and defined heirs the right to terminate existing grants for such extended renewal period in Section 304(c).  (A.185 ¶ 11.)  This provision was enacted to "safeguard[] authors against unremunerative transfers and improve the bargaining position of authors by giving them a second chance to negotiate more advantageous grants in their works after the works had been sufficiently exploited to determine their value." *Milne v. Stephen Slesinger, Inc.,* 430 F.3d 1036, 1046 (9th Cir. 2005), quoting H.R. REP. NO. 94-1476 at 124, 1976 U.S.C.C.A.N. at 5740 (1976) (quotations omitted; brackets in original).

By the Copyright Term Extension Act of 1998 (the "CTEA" or the "Sonny Bono Act"), Congress extended the 19-year extended renewal term for an additional 20 years, making the ERT 39 years and increasing the term of United States copyright for pre-1978 works to a total of 95 years.  (*Id.*; A.185 ¶ 12; 17 U.S.C. § 304(a).)  The CTEA provided a further termination right in 304(d), but specifically provided that where a termination right had already been exercised under 304(c), there was no 304(d) termination right.  (A.185 ¶ 12; 17 U.S.C. § 304(d).)  Section 304(d) does not require that the prior 304(c) termination actually become *effective*; it merely needs to have been *exercised* to bar any further termination right.  Termination is exercised by the service of a notice of

11

termination and, provided it is recorded with the Copyright Office prior to the effective date, becomes effective on that date. (17 U.S.C. §304(c)(4)(A).)

**C.      The 1981 Exercise Of Coots' Termination Right And The 1981 Agreement For The ERT.**

On September 24, 1981, Coots *exercised* his Section 304(c) termination right by sending EMI the 1981 Notice. (A.54; SPA.3.) The 1981 Notice identified the "effective date" of termination of the 1951 Agreement as "October 23, 1990." *Id*.

The 1981 Notice afforded Coots and Appellants with a "second chance to negotiate [a] more advantageous grant[]…." *Milne,* 430 F.3d at 1046. On December 15, 1981, Coots and Appellants[8] entered into the 1981 Agreement, granting – and thereby "insuring" – EMI the rights for the Song's ERT commencing in 1990 (as provided in the 1981 Notice) in exchange for a non-recoupable payment of $100,000 to Coots' heirs and the payment of royalties during the ERT. (A.59-67 ¶ 4.)

Appellants' current contention is that the 1981 Agreement immediately replaced the 1951 Agreement. However, the 1981 Agreement unambiguously provided that Coots and Appellants were conveying only the Song's ERT and the "balance of the period of copyright" following the renewal term. (A. 59-60, 63-64.)

---

[8] The 1981 Agreement was executed by Coots, his daughter – Appellant Gloria Coots Baldwin – and his three other – now deceased – children. (A.63, SPA.4 n. 13.)

It expressly acknowledged that EMI already owned the still extant renewal term (the second 28 year period commencing in 1962). And it further stated that the period of copyright had been extended from 56 years to 75 years and that the parties desired to "*insure*" that for the "*balance of the period of copyright*" – the additional 19 year period commencing October 23, 1990 as provided in the 1981 Notice – EMI would continue to own all US rights in the Song. (A.59-60, 63-64; SPA.4.)

The 1981 Agreement specifically granted EMI the ERT that would have reverted to Coots and Appellants in 1990 assuming they *effected* termination of the 1951 Agreement in compliance with the requirements of Section 304(c). (A.60-61 ¶ 3.) Coots represented and warranted that he had recorded the 1981 Notice in the US Copyright Office. (*Id.*) Had the 1981 Notice been recorded, termination of the 1951 Agreement would have become effective in October 1990, at which point EMI's ownership and right to publish would have been provided by the 1981 Agreement. If termination were not effected under Section 304(c) (as the Court found it was not), EMI's rights would continue under the 1951 Agreement. (SPA.19.) As the 1981 Agreement expressly contemplated, EMI's ERT rights were thus insured.

At Coots' insistence, (A.1495, 1501-02), his heirs each executed an independent grant by which each:

[G]rants, transfers and assigns to Grantee all of [the heirs'] rights and interests in and to the United States copyrights in [the Song] for the extended renewal term thereof, together with the copyrights for such extended renewal term, and each of the undersigned covenants and undertakes and agrees to be bound by all of the terms and conditions of this foregoing agreement.

These (and Coots') grants were made in exchange for a $100,000 payment made directly to the heirs.  (A.62.)  There is no dispute that the heirs were paid the $100,000 by checks directly from EMI.  (A.228-229, 236-244, 264-265, 271-272.)  Indeed, Krasilovsky testified that the reason for serving the 304(c) Notice was precisely "[b]ecause the family wanted a hundred thousand dollars."  (A.260.)

The 1981 Agreement does not provide for the payment of any royalties to Coots or Appellants until the commencement of the ERT.  (A.62 ¶ 4(b).)  If Appellants' immediate termination argument had any force, Coots and Appellants would have forfeited any right to royalties from 1981 to 1990.  As the Court found, this was not what occurred as they were paid royalties under the 1951 Agreement. (A.227-228; SPA.22.)

Appellants' immediate termination argument is not only refuted by the plain terms of the 1981 Agreement, but by Appellants' own witnesses.  Appellant Baldwin and Krasilovsky, Coots' attorney, both testified that the 1981 Agreement was to take effect only on the anticipated termination of the 1951 Agreement in 1990.

14

Ms. Baldwin testified that "the 1981 Agreement that we signed was, as I understood it at the time, was *just an extension of publishing rights for another 19 years*," and that such 19 year extended renewal period was to run from 1990. (A.227.)  She further testified that "the 1981 agreement was the [sic], *to extend the agreement that was in effect in 1981 another 19 years*.  That [1951] agreement, the one that was valid at that point was due to expire in 1990.  My understanding at the time was, of the copyright law, that it was extended for another 19 years.  So *from 1990 to 2009*."  (A.231, emphases added.)  Ms. Baldwin's testimony was consistent with a letter she wrote to the Songwriter's Guild of America ("SGA") in 2002 expressing her belief that "[t]hey [sic] way I read this [1981 A]greement *it extended the original agreement from 1990 for an additional 19 years*."  (A.232, 246, emphasis added.)[9]

Krasilovsky's contemporaneous view of the 1981 Agreement, expressed in a November 1981 letter to J. Fred Coots, Jr., was the same as Baldwin's.  He stated that the purpose of the negotiation was for EMI "*to acquire these termination rights which cover the additional nineteen (19) years of copyright commencing in 1990*."  (A.277-278, emphasis added.)  EMI similarly identified the rights conveyed as those in the Song's "extended renewal term."  (A.416-417.)

---

[9] In 1981 the ERT was only a 19 year period.  The CTEA extended that term an additional 20 years.

Appellant Bergdahl also had the same understanding.  She testified that the 1981 Agreement "shows that the termination date would be 1990" and that, through the 1981 Agreement, "we [the Coots family] were giving them [EMI] the 19 years from 1990" that constituted the ERT rights in the Song at the time the 1981 Agreement was entered.  (A.282-283.)

In short, Appellants' immediate termination argument is contrary to law, contrary to the 1981 Agreement and, assuming it were at all relevant, also contrary to the "intent" of the parties as shown by undisputed testimony and evidence.

### D. The 1981 Notice Is Not Recorded.

On November 25, 1981, Krasilovsky sent the 1981 Notice to the Copyright office for recordation.  (A.56-57; SPA.3.)  On May 7, 1982, an examiner from the Copyright Office sent a letter (the "1982 Letter") to Krasilovsky stating that "[p]ursuant to our telephone conversation of March 1, 1982, we are returning the above mentioned document [the 1981 Notice] to you unrecorded."  (A.69-70, SPA.5.)  Krasilovsky's transmittal of the 1981 Notice was copied to EMI (A.56-57), his receipt of the 1982 Letter was not (A.69-70), and he had no recollection of the 1982 Letter and never did anything about it.  (A.455, 1238-39.)

While not material to any issue in this case, the unrebutted testimony of EMI's witnesses confirms that until Appellants attached the 1982 Letter to their original Florida complaint, EMI did not know that the 1981 Notice had not been

recorded as required to effect termination of the 1951 Agreement pursuant to 304(c) of the Act. (A.1346-47, 1351, 1371-72.) The 1981 Notice had to be recorded no later than the effective date of the 1981 Notice, October 23, 1990.[10]

### E. The 2004 304(d) Notice Purporting To Terminate The 1951 Agreement.

On April 6, 2004, Appellants sent EMI a notice under Section 304(d) purporting to terminate the 1951 Agreement effective as of September 27, 2009. (A.20-21 ¶ 27-28, 72-76; SPA.5.) The 2004 Notice stated that "no termination was previously made by the parties effecting termination under section 304(c)." (A.75.)

While Appellants have argued that the 2004 Notice applied to the 1981 Agreement, that is impossible. Section 304 applies only to pre-1978 agreements. The only extant pre-1978 Agreement was the 1951 Agreement. (A.188 ¶ 23.) The Notice also was served prior to any theoretically possible window for terminating the 1981 Agreement.[11]

The contention is also refuted by the evidence. Correspondence between Krasilovsky and Warner/Chappell (which was representing Appellants with respect

---

[10] Appellants reference a 2004 email in which an EMI employee advises that she could not locate the 1981 Notice online (Telnet). (Opening Br. at 17, citing A.490.) It is irrelevant. Even if EMI discovered that the 1981 Notice had not been recorded in 2004, it was already 14 years too late for the notice to be recorded.

[11] Even assuming the 1981 Agreement could be terminated at all and assuming further it could have been terminated as of 2016 (as Appellants now contend), a notice seeking to terminate the 1981 Agreement could not have been served until, at the earliest, 2006. *See* 17 U.S.C. §§ 203(a)(3), (4)(A).

to certain Coots' compositions, *see* A.223) confirms that the 2004 Notice applied to the 1951 Agreement.  In a September 28, 2008 e-mail to Warner, Krasilovsky described the 2004 Notice as "the earlier termination filed by Warner Chappel [sic] based on *disregarding that 1981 agreement* based upon failure to file the statutory required copy with the copyright office." (A.1476, emphasis added.)   Warner responded that "based on the facts in your email and an objective reading of the US Copyright Law, if no Section 304(c) notice of termination was served and recorded with the Copyright office, then the Section 304(d) termination notice (which I believe was filed by the Songwriter's Guild of America) would appear to be valid to affect termination in 2009." (A.1475.)[12]

Warner subsequently wrote to EMI claiming that Appellants could terminate EMI's ERT rights effective September 27, 2009 by virtue of the 2004 Notice. (A.223.)  The only agreement that could have been terminated effective in 2009 or by the 2004 Notice under 304(d) was the 1951 Agreement.   Section 304 is inapplicable to post 1977 agreements.  Appellants' argument that a Section 304 Notice was intended to apply to the 1981 Agreement is disingenuous.

---

[12] In fact, Warner read Section 304(d) incorrectly if it conceived that both service and recordation of a termination notice under 304(c) were required to exercise the right.

**F.     Appellants' 2007 Section 203 Notice And Confirmation That The 1981 Agreement Applied Only To The ERT Commencing In 1990.**

In October 2006, Krasilovsky wrote to EMI stating that "a section 203 Notice of Termination should be used to replace the 304 notice previously sent" and attached a draft section 203 notice. (A.286-89.) Inconsistent with Appellants' "immediate termination" theory, the Notice describes the 1981 Agreement as follows:

> Author J. Fred Coots, composer of music had previously signed music publishing contract with an affiliate of Robbins Music Corp, Leo Feist Inc. *And by the new grant to Robbins Music Corp. [the 1981 Agreement] acted to assign to Robbins Music Corp. and its successors and assigns the terminated rights under section 304(c) for then applicable extended renewal term.*

(A.288, emphasis added.)

Again, in 2006, EMI personnel were unaware that the 1981 Notice had never been recorded, leaving the 1951 Agreement extant. They also failed to recognize that as heirs, Appellants could not terminate their own grants under Section 203 (and that the earliest 203 termination right was not until 2021). They therefore assumed that Appellants could terminate the 1981 Agreement in 2016. The erroneous views of EMI's personnel are irrelevant since the 1951 Agreement has not been and cannot be terminated. (A.913-914, 924-927, 949-963, 1106-1107.)

On April 17, 2007, Appellants sent EMI a termination notice purporting to terminate the 1981 Agreement under Section 203 of the 1976 Copyright Act,

effective December 15, 2016 (the "2007 Notice"). (A.81-82.) Thereafter, operating under their mistaken understanding, EMI made a contingent offer, expressly subject to due diligence and management approval, to purchase the ERT rights that Appellants did not in fact possess. (A.311-313.) Appellants equally mistakenly rejected the proposal, turning down $2.75 million for rights they did not have. (A.311.)

### G. Appellants' 2012 Section 203 Notice.

EMI's motion to dismiss the original complaint in the Florida Action (discussed at II.B, *infra*) showed that the 2007 Notice was, at best, premature. Appellants then served a new 203 notice with an effective date of December 15, 2021 (the "2012 Notice"). (A.88-89.) The 2012 Notice identifies the 1981 Agreement as the grant it purports to terminate and identifies the date of publication of the Song under the grant as the effective date of the 1981 Notice, *i.e.*, October 23, 1990. (*Id.*)

## II. Relevant Procedural History.

### A. The Florida Action And Appellants' Admissions Therein.

On December 16, 2011, Appellants (and another Coots heir, Robin Coots) sued EMI in the Southern District of Florida seeking declarations that the 2004 Notice and 2007 Notice terminated EMI's rights in the Song. *See Gloria Coots*

20

*Baldwin, et al. v. EMI Feist Catalog, Inc.*, Case No. 9:11-cv-81354-KAM (Marra, J.) (the "Florida Action").

Appellants' first claim (A. 206-221) contended that the 1951 Agreement had not been terminated under Section 304(c) and therefore Appellants had properly terminated the 1951 Agreement under 304(d) in 2009 by the 2004 Notice. (A.219 ¶ 61.) The second claim sought a declaration that the 2007 Notice was valid and enforceable to terminate the 1981 Agreement in 2016. (A.219-220 ¶¶ 62-69.) Appellants' third claim sought recovery of money earned by EMI subsequent to 2009. (A. 220 ¶¶ 71-72.) Appellant's first and third claims were consistent only with Krasilovsky's concept of "disregarding that 1981 agreement based upon failure to file the statutory required copy with the Copyright Office." (A.1476.)

Appellants' original complaint thus claimed – completely contrary to their current claim – that the 1951 Agreement remained extant until 2009 because they never filed the 1981 Notice with the Copyright Office. (A.217-218 ¶¶ 47-60.) Appellants erroneously conceived that, despite having exercised a termination right under 304(c), they could terminate the 1951 Agreement under 304(d) because of their own failure to record the 1981 304(c) Notice. Contrary to their current immediate termination argument, Appellants' original Florida complaint unequivocally admitted that the 1951 Agreement remained extant. (A.217-218, ¶¶ 47 and 61.)

21

Appellants also admitted – contrary to their new thesis that two agreements cannot co-exist – that the 1951 Agreement and 1934 Agreement had co-existed from 1951-1962.  (A.217 ¶ 50 ("…the 1981 notice became invalid because, in 1981, the 1934 grant could not have been terminated as it had already expired in 1962…").)

On January 31, 2012, EMI moved to dismiss Appellants' original complaint in the Florida Action for lack of personal jurisdiction and for failure to state a claim.  (A.315-336.)

EMI's motion showed that Appellants' Section 304 termination rights were exhausted by their service of the 1981 Notice and that the 1951 Agreement could therefore not be terminated under 304(d).  (A.323-330.)  With respect to Appellant's purported termination of the 1981 Agreement, even if the 1951 Agreement were not extant, Appellants could not terminate their own 1981 grant of rights under Section 203 and, even if they could, the 1981 Agreement could not be terminated until 2021 (the 203 termination right takes effect the earlier of 40 years from the date of the agreement (2021) or 35 years from first publication under the agreement, which would have been 1990 (2025).  (A.330-331.)

## B.    The Amended Florida Complaint.

Rather than oppose EMI's motion to dismiss, Appellants moved for leave to amend.  The Florida court granted the motion, denied EMI's 12(b)(6) motion as

22

mooted by the impending amendment, and ordered that EMI's jurisdictional motion remained pending. (A. 338-340.)

Appellants filed their amended complaint. (A. 342-368 (the "Amended Florida Complaint").) Appellants abandoned their 304(d) termination claim as well as their corresponding unjust enrichment claim. Appellants retained their Section 203 termination claim based on the 2007 Notice, and added a new 203 claim based on their 2012 Notice purportedly effective in 2021. (A.366.)

EMI moved to dismiss the Amended Florida Complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim (on substantially the same bases set forth in the summary judgment motion below) and renewed its 12(b)(2) motion to dismiss for lack of personal jurisdiction. (A.369-393.) At the Florida Court's direction, the parties conducted and completed discovery.

On December 10, 2012 the Florida court issued an order dismissing the Florida Action for lack of personal jurisdiction. (A.395-404.) The Court did not address the merits of EMI's 12(b)(6) motion, denying it without prejudice. (A.404.)

### C.    **Appellants' Action In The Southern District Of New York.**

On December 21, 2012, Appellants filed the complaint in this Action. (A.13-89 ("Complaint").) The Complaint did not claim the 1951 Agreement had been terminated pursuant to the 2004 Notice. Instead, the Complaint asserted the immediate termination argument as a means of eliminating the 1951 Agreement.

(A.29 ¶ 74.)  The Complaint also requested a declaration that the 2007 Notice was effective to terminate the 1981 Agreement in 2016, or, alternatively, that the 2012 Notice was effective to terminate the 1981 Agreement in 2021.  (A.37.)

On May 10, 2013, EMI moved for summary judgment.  (A.180-181.)

### D.    **EMI's Motion For Summary Judgment.**

EMI's motion showed that while Appellants' service of the 1981 Notice *"exercised"* the termination right under Section 304(c), termination of the 1951 Agreement was never effected due to the failure to record the 1981 Notice.[13]  Thus, the 1951 Agreement continues for the remainder of the extended renewal term in the Song.[14]

EMI also argued that the Appellants could not terminate their own grant of rights in the 1981 Agreement (A.189 ¶ 26), and that, under 17 U.S.C. § 203(a)(3), even if Appellants could terminate the 1951 Agreement and could terminate their own grant of rights in the 1981 Agreement, the earliest possible effective date for

---

[13] *See* 17 U.S.C. § 304(d) (emphasis added) stating that a further right of termination is available under Section 304 only "where the author or owner of the termination right has not previously *exercised* such termination right," and 17 U.S.C. § 304(c)(2) identifying the process for *exercising* the termination right, as opposed to *effecting* termination, which is described at Section 304(c)(4)(A). (A.185, 188 ¶¶ 12-13, 23-24.)

[14] Under the Copyright Act unless a termination notice is recorded before its effective date it does not take effect.  *See* 17 U.S.C. 304(c)(4)(A).  Critically, under 17 U.S.C. 304(c)(6)(F), *"Unless and until termination is effected under this subsection, the grant, if it does not provide otherwise, continues in effect for the remainder of the extended renewal term.*" (A.186-187 ¶¶ 15-19, emphasis added.)

termination of the 1981 Agreement would be 2021 (the earlier of 40 years from the execution of the 1981 Agreement (2021) or 35 years from publication of the work under the grant in 1990 (2025)).  (A.198-200 ¶¶ 49-51, 55-56.)

### E.     Appellants' Motion For Summary Judgment And Opposition To EMI's Motion.

Appellants opposed EMI's motion for summary judgment and filed their own motion for summary judgment.  Appellants' motion was essentially an exercise in avoiding page limits as they inconsistently cited the same irrelevant "facts" and unsupported legal conclusions as "disputed" in opposing EMI's motion, and "undisputed" in their own motion.  (A.544-568, 1114-1137.)

Given the clarity of the 1981 Agreement and the undisputed facts and law, all of which refuted Appellants' claims, Appellants' motion and opposition were largely based on legal theories espoused by their purported expert, Lisa Alter.  In violation of Fed R. Civ. P. 56(c) and Local Rule 56.1, Appellants substituted irrelevant facts and legal arguments (largely drawn from Ms. Alter) for disputed issues of material fact.  Ms. Alter's "opinions" had no support aside from her "experience" as an attorney and ignored the record evidence.[15]  (*See* A.544-568, A.1117-1137.)   EMI's reply documented every instance where Appellants'

---

[15] EMI moved to strike the Alter Affidavit (A.1150-1151) on the basis that Alter was an impermissible expert on domestic law, and that her conclusions ignored or contradicted the undisputed facts and had no basis in the law.  (A.1152-1168.)  The Court granted this motion.  (SPA.16.)

assertions were either immaterial and irrelevant, or based purely on legal argument without any citation to admissible evidence.  (A.1248-1276, 1410-1473.)

Relying solely on the Alter Affidavit, Appellants argued that the non-recordation of the 1981 Notice "is and was irrelevant" to the litigation; that it was EMI, not Coots, who was responsible for recording the 1981 Notice (even though Coots represented and warranted in the 1981 Agreement that he had recorded or would record it); that the 1981 Agreement, on a "de facto" basis, immediately terminated the 1951 Agreement and granted rights commencing in 1981, not at the start of the ERT in 1990; that the heirs' grant of rights on page 5 of the 1981 Agreement was meaningless and that they were not parties to the 1981 Agreement; and that the Section 203(a)(3) calculation for termination was not meant to apply to works already in publication.  (A.547-552  ¶¶ 15, 19, A.1120-35 ¶¶ 10, 13, 25, 35, 54.)

To mask their total reliance on Alter, Appellants also misrepresented "facts" that were irrelevant even had they been accurate.  Appellants argued that EMI knew that the 1981 Notice was never recorded.  (A.1129 ¶ 36.)[16]  They argued that EMI believed the 2004 Notice was directed at the 1981 Agreement and that the

---

[16] As noted above, the uncontradicted evidence is to the contrary.  EMI was unaware that the 1981 Notice had not been recorded until Appellants filed their original complaint in Florida in 2011.

1981 Agreement was "the only grant in force at the time"[17] (A.1130-1131 ¶ 42), both of which are untrue and neither of which has any bearing on the material issues in this litigation.

Finally, Appellants neither claimed in their Complaint nor argued to the Court, as they do on appeal, that the 2004 Notice under Section 304(d) terminated the 1951 Agreement. Rather, Appellants argued that the 2004 Notice was not an attempt to terminate the 1951 Agreement – even though 304(d) is only applicable to pre-1978 agreements and the 1951 Agreement was the only pre-1978 agreement extant in 2004. (A.553-55 ¶ 23.)

## III.    **The Disposition Below.**

In a December 16, 2013 opinion and order (SPA.1-26) and a December 17, 2013 judgment (SPA.27), the Court: (1) granted EMI's motion for summary judgment; (2) granted EMI's motion to strike the Alter Affidavit; and (3) denied Appellants' motion for summary judgment.

---

[17] The single piece of evidence cited for this contention, a draft affidavit contesting the 2004 Notice, states only that Appellants could not terminate EMI's rights by virtue of the 2004 Notice because there also existed a 1981 Agreement pursuant to which Appellants themselves made an "exclusive grant of rights for the extended renewal term of copyright" and to which the 2004 Notice could not apply as it is a post-1977 grant. (*See* A.510-511, 1265-67 ¶ 42.) This draft affidavit actually shows that EMI understood the 2004 Notice was directed to the 1951 Agreement (as a 304 Notice can only apply to a pre-1978 Agreement), contrary to Appellants' assertion here. *See* Opening Br. at 17.

27

The Court noted that "[i]n both their own summary judgment motion and their opposition motion, Plaintiffs rely heavily on the Affidavit of Lisa Alter – their purported copyright law expert." (SPA.13.) The Court found that Alter's opinion lacked citation and was inadmissible as pure legal conclusions. (SPA.14-16.) Accordingly, the Court struck the Alter Affidavit.

Turning to the summary judgment motions,[18] the Court held that, although Appellants exercised their right to terminate the 1951 Agreement by serving the 1981 Notice, they failed to effect termination by recording the notice as required by Section 304(c)(4)(A) and that therefore, under Section 304(C)(6)(F), the 1951 Agreement remains in effect until 2029. (SPA.16-17, 19.)

The Court rejected Appellants' immediate termination argument, finding it undisputed that 1981 Agreement expressly insured that EMI would retain the ERT for the Song commencing in 1990:

> Nothing in the 1981 Agreement suggests that the parties intended it to immediately supercede the earlier agreement. Instead, the 1981 Agreement was intended to "insure" that EMI would retain its copyright interest for the Extended Renewal Term. Under the 1976 Act, the Extended Renewal Term would commence in 1990, at the end of the renewal term. The grant language of the 1981 Agreement also conveyed only the "Extended Term of Renewal Copyright." Furthermore, the 1981 Notice is titled "Notice of Termination Covering Extended Renewal Term (Under Section 304(c))"

---

[18] The district court later noted that "Plaintiffs often rely on the Alter Affidavit – which I deem inadmissible – to support their arguments. While I give the Alter Affidavit no evidentiary weight, I will nonetheless address the merits of those arguments." (SPA.17 n.75.)

\*\*\*

> [T]he 1981 notice was intended to terminate the 1951 Agreement on "the earliest possible date under the Copyright Act of 1976 [pursuant to paragraph 3(a) of the 1981 Agreement]." By its own terms, this date was October 23, 1990 – the effective date of the 1981 Notice. However, because the 1981 Notice was never recorded, the "earliest date possible" to terminate the 1951 Agreement is 2029.

(SPA.20-21.)

The Court also found that the 1981 Agreement plainly showed that it did not immediately terminate the 1951 Agreement (SPA.22-24), noting, among other provisions, the fact that royalty payments under the 1981 Agreement would not commence until 1990 (otherwise Appellants would have forfeited the right to royalties from 1981 to 1990). (SPA.22.)

The Court described Appellants' argument that language granting rights in the 1981 Agreement "whatsoever now or hereafter known or existing" served to terminate and replace the 1951 Agreement in the face of Appellants' own warranties that they would effect termination "in full compliance with the requirements of the Copyright Act of 1976" as "grasping at straws," and held that such language did not constitute the requisite clear expression under New York contract law for an agreement to supersede a prior agreement. (SPA.22.)

The Court also ruled – even though Appellants had not claimed that the 2004 Notice terminated the 1951 Agreement – that because Appellants had exercised

their 304 termination right in 1981 (pursuant to 304(c)), they "do not get a second bite at the termination apple" to terminate pursuant to Section 304(d) through the 2004 Notice. (SPA.24-25.)

Concluding that the 1951 Agreement could not be terminated, the Court did not need to reach the parties' arguments regarding the 2007 Notice or the 2012 Notice.

On January 15, 2014, Appellants filed a notice of appeal of the Order and Judgment. (A.1547.)

## SUMMARY OF THE ARGUMENT

The 1951 Agreement was not terminated by the 1981 Notice because the notice was never recorded with the Copyright Office as required by Section 304(c)(4)(A). Because Appellants exercised their termination rights under Section 304(c), they have no 304(d) termination rights. Section 304(d) expressly bars "a second bite at the termination apple." As such, the 1951 Agreement continues in effect until expiration of the US copyright in 2029 pursuant to 304(c)(6)(F).

The 1981 Agreement did not terminate or supersede the 1951 Agreement, either by its express terms or, as Appellants argue, by its "nature." Nothing in the 1981 Agreement suggests that it replaced the earlier agreement. On the contrary, by its plain terms, the 1981 Agreement "insured" that EMI would retain the Song for the ERT commencing in 1990. Had Appellants recorded the 1981 Notice, the

30

1951 Agreement would have terminated in 1990 and the ERT rights would have remained with EMI by virtue of the 1981 Agreement. If Appellants failed to record the 1981 Notice (which turned out to be the case), EMI would retain the ERT rights under the still extant 1951 Agreement. Appellants' arguments to the contrary, including their argument that all agreements made between a grantor and an original grantee pursuant to Section 304(c)(6)(D) automatically and immediately terminate the prior grant regardless of what they actually say, have no legal or factual basis.

Assuming *arguendo* that the 1951 Agreement somehow did not exist, Appellants, as grantors under the 1981 Agreement, cannot terminate their own grant under Section 203. And even if Appellants could terminate their own grant in the 1981 Agreement, because the right of publication under the 1981 Agreement did not arise until the 1990 effective date of the 1981 Notice (assuming it had become effective), the earliest that Appellants' could terminate that grant would be 2021 (the earlier of 40 years from the date of the execution of the 1981 Agreement or 35 years from the first publication under the 1981 Agreement in 1990).

# ARGUMENT

## I.

## THE DISTRICT COURT'S HOLDING THAT THE 1951 AGREEMENT WAS NEVER TERMINATED AND CANNOT BE TERMINATED IS CORRECT.

### A.    Coots Failed To Effect Termination Of The 1951 Agreement.

Coots *exercised* his right to terminate the 1951 Agreement under § 304(c), sending the 1981 Notice to EMI on September 24, 1981.  However, 17 U.S.C. § 304(c)(4)(A) requires that "[a] copy of the notice shall be recorded in the Copyright Office before the effective date of termination, *as a condition to its taking effect.*"  (Emphasis added.)  *See also* 17 U.S.C. § 304(c)(6) (explaining that rights revert to author or heirs "upon the *effective* date of termination").  Absent timely recordation, the original grant continues for the remainder of the extended renewal term.  *See* 17 U.S.C. § 304(c)(6)(F).

It is undisputed that the 1981 Notice was never recorded in the Copyright Office, and therefore never became effective. (A.20 ¶ 25, A.69-70, 1121 ¶ 11.) Section 304(c)(6)(F) provides that "[u]nless and until termination is *effected* under this subsection, the grant, if it does not provide otherwise, continues in effect for the remainder of the extended renewal term." 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* 11.06[B] at 11-70 n. 69 (Rev. Ed.) ("if a grant was

32

not effectively terminated, then the rights licensed under such grant remain").[19]  As a result, the 1951 Agreement remains in effect until 2029, the expiration of the remainder of the ERT.

As even Appellants' copyright law "expert," Lisa Alter, admitted, unless the 1951 Agreement were somehow terminated, EMI's ownership of the US copyright would continue until 2029.  (A.1399-1400 ¶ 13(c), A.1198.)  So Appellants make two completely irreconcilable arguments.  First is their immediate termination argument, either because of the "nature" of the 1981 Agreement, or because that agreement "expressed an intention" to terminate the 1951 Agreement (as opposed to its actual terms).  Second is the belated revival of their original claim from the Florida Action – nowhere pleaded in this action or argued to the Court below – that the still extant 1951 Agreement was terminated by the 2004 Notice under 304(d).

**B.    The 1981 Agreement Did Not, "As A Matter of Contract Interpretation," Terminate The 1951 Agreement.**

The 1981 Agreement unequivocally provides that the 1951 Agreement continued in effect unless and until it was terminated in accordance with the procedures of § 304(c) (which  never occurred).

The first three "Whereas" clauses and the specific grant itself confirm that the 1981 Agreement solely addressed the additional 19 year "balance" of US

---

[19] Appellants do not dispute that the 1951 Agreement "does not provide otherwise." (*See* A.1399 ¶ 13(b).)

copyright (the ERT). (A.59.) The 1981 Agreement acknowledged that EMI already owned the copyright for the renewal term (which would not end until 1990) under the 1951 Agreement. It granted EMI the rights that would revert back to Coots and his heirs in 1990 if they effected termination of the 1951 grant under Section 304 by filing their 1981 Notice with the Copyright Office. (A.59-61.) The grant language of the 1981 Agreement conveyed only the "Extended Term of Renewal Copyright," a term which would not commence until expiration of the renewal term, already owned by EMI, in 1990. (A.62-63.)

Paragraph 3(a) of the agreement further confirms that the 1981 Agreement did not terminate the 1951 Agreement:

> Grantor represents, warrants, covenants, undertakes and agrees: Grantor has duly executed, served upon Grantee, and *recorded in the Copyright Office a Notice of Termination in full compliance with the requirements of the Copyright Act of 1976* and the regulations of the Register of Copyrights pertaining thereto which shall for the purposes of this agreement and Section 304(c)(6)(D) of the Copyright Act of 1976 be deemed to have been served upon Grantee, in advance of any further grant of rights hereunder, *and shall be deemed to take effect at the earliest date possible under the Copyright Act of 1976* and the regulations prescribed by the Register of Copyrights.

(A.60 ¶ 3(a), emphases added.)

Paragraph 4(b) of the 1981 Agreement, which provides for the payment of royalties *solely during the extended renewal term* (commencing in 1990), also refutes Appellants' immediate termination argument. (A.62 ¶ 4(b).)

34

The 1981 Agreement did not "provide[] for replacement and termination of the 1951 [Agreement]," or "express[] an intention" to do so. (Opening Br. at 42-43.) The opposite is true. Appellants represented they had recorded the 1981 Notice with the Copyright Office and it was therefore anticipated that termination of the 1951 Agreement would be effected on the effective date of the 1981 Notice (October 23, 1990), the *"earliest date possible under the Copyright Act of 1976."* It never happened because the 1981 Notice was not recorded.

Appellants half-heartedly argue that the 1981 Agreement, "as a matter of contract interpretation," terminated the 1951 Agreement. (Opening Br. at § VII.A.2, pp. 42-47.) Conspicuous by its absence is any reference to language in the 1981 Agreement that supports such argument because there is none. Even Appellants' "expert" Lisa Alter admitted that EMI already owned the renewal term and what was being granted was the additional 19 year period. (A.1400, 1406-1407 ¶¶ 13, 25-26; A.1215.) To fill the gap, Appellants offer "premises," presumptions, and citations to Webster's dictionary.

Appellants repeatedly state that the 1981 Agreement is "premised" on termination of the 1951 Agreement, offering nothing to support such "premise." (Opening Br. at 43 and 47.) By its express terms, the "premise" of the 1981 Agreement was to "insure" EMI's continued ownership of the Song in the ERT (starting in 1990). The 1981 Agreement had nothing to do with the remaining 9

years of the renewal term, which EMI already owned.  If termination of the 1951 Agreement were effected in accordance with the requirements of Section 304(c), EMI would own the ERT by virtue of the 1981 Agreement.  If termination of the 1951 Agreement were not effected, EMI would own the ERT by virtue of the extant 1951 Agreement.  Appellants' premise does not exist.

Appellants argue that the provision in the 1981 Agreement that states the 1981 Notice "shall be deemed to take effect at the earliest date possible under the Copyright Act of 1976," means that the 1951 Agreement was deemed to have been terminated.  (*Id*. at 43.)  But that is not what the provision says.  The provision invokes operation of Section 304(c), which makes a notice of termination effective on the date specified in the notice, provided it is recorded with the Copyright Office on or before that date.  The provision simply reflects the parties' agreement that, assuming compliance with the recordation requirement of 304(c) of the Act, the 1981 Notice will be deemed to take effect on the earliest date possible under the Act (October 23, 1990).  (SPA.21.)

Appellants argue that the Court must be incorrect because it held that the "earliest date possible" to terminate the 1951 Agreement is 2029.  (Opening Br. at 44-46.)  They say that is impossible because the CTEA had not been passed in 1981 and so the parties could not have anticipated the 2029 date.  (*Id.* at 45.)  This argument is purposefully misleading.

There is no dispute that, in 1981, the ERT was 19 years and the US copyright in the Song would expire in 2009. CTEA added the additional 20 years, extending the US copyright in the Song to 2029. The Court's reference to 2029 is correctly dictated by the plain terms of Section 304(c)(6)(F). Because Appellants *exercised* their 304(c) termination right in 1981, they have no 304(d) termination right. As a pre-1978 Agreement, the 1951 Agreement cannot be terminated under Section 203. Because Appellants failed to *effect* termination of the 1951 Agreement, Section 304(c)(6)(F) dictates that it continues in effect until the expiration of the ERT, which is now 2029. Whether or not CTEA was anticipated by the parties in 1981 is irrelevant.[20] (SPA.21.)

Appellants also rehash their argument that the "heretofore or at any time or times hereafter acquired or possessed by Grantor" language contained in the 1981 Agreement "underscores" that the 1951 Agreement was terminated. (Opening Br. at 43-44.) But, as the Court held, this is "grasping at straws." (SPA.22.) "Under New York contract law, the parties must have 'clearly expressed their intention

---

[20] Appellants also argue that because it is "possible" to terminate a prior grant by entering into a new one "[b]y entering into the 1981 Grant and deeming termination to take effect at the earliest possible date under the 1976 Act, the 1981 Grant should therefore be held to mean that the 1951 Agreement was terminated immediately." (Opening Br. at 45.) This argument defies the clear terms of the 1981 Agreement, ignores established New York law and the plain language of the Act. Nowhere does the 1981 Agreement, expressly or even impliedly, terminate the 1951 Agreement. It does the opposite.

that a subsequent agreement superseded or substituted for an old agreement,'" and this clause hardly expresses such an intention. (*Id.* at 22-23.)

Indeed, it is undisputed that EMI already owned all rights in the Song other than the rights for the 19 year ERT and the 1981 Agreement granted it nothing that it did not already own other than this 19 year period. *See Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 986 (9th Cir. 2008) (where grantee already owned the motion picture, television and radio rights, heir had nothing to assign in 1978 Assignment "other than the additional ancillary rights she transferred for $3,000," and so language in 1978 Assignment purporting to assign the motion picture, television and radio rights was "a nullity").

The 1981 Agreement is replete with provisions – all of which Appellants studiously ignore – which make completely clear that the 1981 Agreement was not intended to and did not "immediately replace" the 1951 Agreement. Again, Appellants' arguments exist in thin air, lacking any tether to the 1981 Agreement or applicable law.

Appellants also advance a new argument trying to deflect the Court's observation that the royalty provision of the 1981 Agreement cannot be reconciled with the immediate termination argument. Divorcing their argument from the actual language of the provision, Appellants claim that because the provision states that royalties are to be paid in consideration of EMI "acquiring all rights as in this

agreement provided," it must mean that the 1981 Agreement terminated the 1951 Agreement because if the 1951 Agreement continued, "there would be no need for EMI to acquire all rights."  (Opening Br. 44.)

What the royalty provision actually says (ignored by Appellants): "In further consideration of Grantee acquiring all rights as in this agreement provided, and conditioned thereon, Grantee shall pay to Grantor *during the period of the Extended Renewal Term of Copyright* for [the Song] royalties for the United States as specified in the [1951] Renewal Agreement."[21]  (A.62 ¶ 4(b), emphasis added.) Appellants also ignore that the rights being acquired under the 1981 Agreement were the ERT rights that EMI did not then own, not the renewal term rights EMI already owned under the 1951 Agreement.

Finally, Appellants argue that "common sense alone establishes the district court's error" because, if the 1981 Agreement did not immediately terminate the 1951 Agreement, then both grants would be operative and that is a "legal impossibility."  (Opening Br. at 47-48.)

To begin with, this argument assumes its own conclusion: that the 1981 Agreement was immediately effective with respect to the remaining 9 years of the 28-year renewal term of copyright, which EMI already owned.  In fact, by its

---

[21]  As the Court noted, the provision only provides for the payment of royalties during the ERT (commencing in 1990), making clear that the 1951 Agreement continue to govern at least prior to that date.

express terms, the 1981 Agreement had no application to the renewal term. The argument thus lacks any factual underpinning.

Further, the argument was supported below only by Appellants' rejected "expert," Lisa Alter (SPA.14), and lacks even that here. There is no legal authority for this argument, and Appellants cite none. Indeed, the facts of this case provide examples proving the contrary. Appellants do not dispute that the 1934 Agreement and the 1951 Agreement co-existed from 1951 until 1962 when the 28 year renewal term rights granted by the 1951 Agreement vested.

The co-existence of the 1951 Agreement and 1981 Agreement is no different. The 1981 Agreement granted EMI the ERT rights that would revert to Coots and his heirs in 1990 – the effective date of termination stated in the 1981 Notice – assuming recordation with the Copyright Office. If the 1981 Notice were recorded, then from 1981 through 1990, the 1951 Agreement and 1981 Agreement would co-exist: the 1951 Agreement for the renewal term ending in 1990 and the 1981 Agreement for the ERT starting in 1990. There is nothing unusual (or lacking in common sense) about two such agreements existing and Appellants identify nothing but their *ipse dixit* conclusion to support their argument.

## C.     The 1981 Agreement Did Not, "By Its Nature," Terminate The 1951 Agreement.

Appellants argue that what the 1981 Agreement says is meaningless due solely to their newly created copyright rule that dispenses with the need to read or

honor contracts.  Appellants claim that *any* grant made between an author (or an author's heirs) and the original grantee, after the service of a notice of termination under Section 304(c), automatically, *"by its nature,"* terminates the prior grant, regardless of what the new grant actually says.  (Opening Br. at 34.)

Appellants cite Section 304(c)(6)(D) as their statutory basis for this argument.  It is not there.  It is not anywhere.  It originated with Ms. Alter and she too could not identify a source for this extraordinary proposition that upends centuries of contract law.

According to Alter (and Appellants), Section 304(c)(6)(D) imposes an absolute rule that when a notice of termination is served and thereafter a new agreement is entered into with the original publisher, the new agreement automatically and immediately supersedes and revokes any existing agreement covering the 28 year renewal term.  (A.1404-1406 ¶¶ 19-23; A.1210-11, 1213-17.) Alter could not point to anything in Section 304(c)(6)(D) to support her position.[22]

After claiming that the supposed requirement was express, Ms. Alter admitted it was not in the text of Section 304(c)(6)(D).  (*Id*.)  After suggesting it was in legislative history, Ms. Alter admitted she was unaware of any, retreating to a claim it was "implied" (meaning "it's simply my view of the statute").  (*Id*.)

---

[22] In her deposition, Ms. Alter shifted repeatedly between claiming this alleged "rule" was "express" and "implied."  She even claimed that she got this rule from her "experience in reading contracts."  (*Id.*)

The Court rejected Alter as an expert but her argument lives on in Appellants' brief, albeit with a twist. Appellants contend that this "rule" altering the law of contracts *is* contained in Section 304(c)(6)(D). They go so far as to say it is "axiomatic" under that Section "that the new grant results in termination of the old grant." (Opening Br. at 36.)

Their argument is convoluted in the extreme, undoubtedly because they are trying to torture an extraordinary change in the law out of language that simply cannot bear the weight. They say that because the Section applies to "[a] further grant, or agreement to make a further grant, of any right covered by a <u>terminated grant</u>," and "[t]he exception for existing grantees allows the new grant to be made sooner, but still applies to '<u>such a further grant</u>,' . . . i.e., 'a further grant . . . of any right covered by a <u>terminated grant</u>'" (*id.*, emphases in original), the new grant to an original grantee must automatically terminate the original grant.

This new argument (not made below) is fatuous. It ignores that the "terminated grant" language appears in the first sentence of the Section, which sets forth the rule that a party cannot make a further grant or an agreement to make a further grant of a right covered by a terminated grant until after the effective date of termination (which is when a prior grant would be terminated). This rule is therefore entirely logical and consistent.

The exception to the rule, contained in the second sentence of the Section, provides that the rule does not apply where the grantor wishes to make "an agreement for such a further grant" – that is, an agreement to grant rights in the future – with the original grantee (or its successor). In that case, the grantor and the original grantee may make "an agreement for such a further grant . . . *after the notice of termination has been served* as provided by clause (4) of this subsection." 17 U.S.C. § 304(c)(6)(D) (emphasis added). Unlike the rule applicable to anyone other than the original grantee, under the exception, the grantor need not wait until the effective date of termination of the original grant to make an agreement for a "further grant." A new grant can be made as soon as the notice has been served.

The text does not support Appellants' argument. Indeed, the argument would make the exception to the rule for original grantees nonsensical. A grant to the original grantee prior to the effective date of termination can *never* be the subject of a grant that has *already* been terminated (absent specific provision in the new grant so providing) because, by definition, the new grant is being made prior to the effective date of termination of the prior grant (albeit the operation of the new grant may not take effect until the effective date of termination of the prior grant). This is the very purpose of the exception. Where the effective date in the notice has passed – and termination of the prior agreement has been *effected* – the author or his heirs can make a deal with anyone. Indeed, Appellants concede that

43

one reason for the exception is to "protect[] existing grantees from third-party competition for the new grant *until the stated termination date*, which is two to ten years *after* notice of termination is served," and that the exception "bestow[s] on existing grantees a statutory monopoly on new grants during the period *between notice and termination*."  (Opening Br. at 33-34, emphases added.)

Appellants wrongly claim that the Court's decision "conflicts with *Steinbeck.*"  (*Id.* at 41.)  It does not.  In fact, *Penguin Group (USA) Inc. v. Steinbeck,* 537 F.3d 193 (2d Cir. 2008) – as well as *Milne, Mewborn,* and every other case that has addressed the issue of statutory termination – refute Appellants' arguments.  These cases make clear that, absent language expressly terminating a prior agreement, a new agreement leaves intact a prior agreement regarding rights in the same works.

In *Steinbeck*, this Court found a prior agreement terminated because the 1994 agreement signed by the heir stated that, "when signed by Author and Publisher, *[it] will cancel and supercede the previous agreements,"* so the 1994 agreement left no pre-1978 grant in effect to which Section 304's termination rights could be applied.  *Id.* at 196, 200 (emphasis added).  Here, the 1981 Agreement contained no such language cancelling or terminating the 1951 Agreement.  On the contrary, its terms made clear that it was not superseding or terminating the 1951 Agreement.

44

In *Classic Media, Inc. v. Mewborn*, 532 F.3d at 982, the author's heir entered into a new agreement in 1978 that "did not substitute for or revoke the 1976 Assignment . . ." The Court held that the prior agreement "remained intact" and could be terminated under § 304. *Mewborn* specifically distinguished the same Court's prior decision in *Milne,* 430 F.3d at 1040, 1044, where the author's heir entered into a new agreement in 1983 that *"expressly revoked"* a 1930 grant and a 1961 grant and those grants were therefore no longer in existence and not subject to statutory termination.

Appellants intentionally misrepresent the Court's decision, stating it "implies that recordation is a prerequisite to the validity of a mutually agreed new grant if a notice of termination was served, but not if the parties skipped the notice of termination and proceeded directly to entering the new grant." (Opening Br. at 38.) The decision says no such thing. The Court held that if termination were to be accomplished under the termination regime of the Act – which was the case here – then recordation was specifically required by the Act. The Court did not say that the 1981 Agreement could not expressly terminate the 1951 Agreement. It simply held that it did not. (SPA.16-24.)

Unlike the grants in *Steinbeck* and *Milne,* as the Court held, the 1981 Agreement contains no language expressly terminating or replacing the 1951 Agreement. The 1981 Agreement is replete with terms  to the contrary. Like in

*Mewborn*, EMI already owned the renewal term rights under the 1951 Agreement and the 1981 Agreement only granted rights for the additional 19 year extended renewal term. While the 1981 Agreement expressly contemplated that the 1951 Agreement would be terminated on the effective date of the author's termination notice (October 23, 1990) through compliance with the recordation requirements of Section 304(c), Appellants failed to comply with those requirements and, as a result, the 1951 Agreement continues for the full extended renewal term, i.e., through 2029 (304(c)(6)(F)).

### D. Appellants' Contention That The 1981 Agreement Either Intended To Or Did Terminate The 1951 Agreement <u>Is Refuted By Uncontradicted Evidence And Admissions.</u>

The 1981 Agreement is unambiguous. It did not immediately terminate or supersede the 1951 Agreement. Rather, it insured that EMI would retain the ERT rights that were to commence in 1990 and that would have reverted to Appellants had they recorded the 1981 Notice.

However, if there were any need to refer to extrinsic evidence, all of the undisputed evidence (ignored by Appellants) refutes their contentions. The evidence includes the testimony of the only two living witnesses involved in the drafting and execution of the 1981 Agreement – Mr. Krasilovsky and Ms. Baldwin – both of whom testified that the 1981 Agreement was only intended to grant the extended renewal term rights commencing in 1990. Krasilovsky's testimony was

consistent with a contemporaneous letter sent to his client, and Baldwin's testimony was consistent with her letter to the SGA in 2002. (*See* pp. 14-15, *supra*.)

Appellants' current contentions are also contrary to their admission in the Florida Action that the 1951 Agreement survived the 1981 Agreement, claiming they had the right to terminate it pursuant to 304(d) through the 2004 Notice because termination of the 1951 Agreement had never been *effected*.[23] (A.217-218 ¶¶ 46-60.) Appellants 2004 Notice was directed to the still-extant 1951 Agreement. They claimed that the 1981 Notice was invalid because it was directed to the 1934 Agreement and not the 1951 Agreement (making it indisputably clear that they were claiming that the 1951 Agreement still existed). (A.211, 217-218 ¶¶ 19, 46-50.) Indeed, Krasilovsky referred to the 2004 Notice as one "based on disregarding that 1981 agreement based upon failure to file the statutory required copy with the Copyright Office." (A.1476.)

Appellants' *post-hoc* immediate termination argument is therefore contradicted by their own actions and judicial admissions. *See United States v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984) ("The law is quite clear that [superseded] pleadings constitute the admissions of a party-opponent and are admissible in the case in which they were originally filed as well as in any subsequent litigation

---

[23] As noted, Appellants also make the same argument on this appeal, even though no such claim is pleaded in their complaint and they made no such argument below.

involving that party. A party thus cannot advance one version of the facts in its pleadings, conclude that its interests would be better served by a different version, and amend its pleadings to incorporate that version, safe in the belief that the trier of fact will never learn of the change in stories.") (internl citations omitted); *Bakalar v. Vavra*, 619 F.3d 136, 151-52 (2d Cir. 2010) (relying on admission from subsequently amended complaint).

### E. The 2004 Notice Did Not And Could Not Terminate The 1951 Agreement.

Appellants argue in the alternative that, even if the 1981 Agreement did not terminate the 1951 Agreement, the 1951 Agreement was terminated by the 2004 Notice. Putting aside that Appellants' service of a Section 304(d) notice in 2004 defeats their immediate termination argument, their argument fails for at least two reasons.

*First*, Appellants made no such claim in their complaint and did not make this argument below. It was the centerpiece of their original Florida Complaint but they dropped the claim after EMI moved to dismiss and have never reasserted it since. As a general rule, when an appellant does not raise an issue before the district court, that issue is not preserved for appeal and this Court will not decide it. *See e.g.*, *Barbour v. City of White Plains*, 700 F.3d 631, 634 (2d Cir. 2012); *Kim v. Columbia Univ.*, 487 F. App'x 600, 602 (2d Cir. 2012) citing *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 132 (2d Cir. 2008). Appellants cannot

48

appeal from summary judgment based on a claim they did not assert in their complaint. *See Poplar Lane Farm LLC v. Fathers of Our Lady of Mercy*, 449 F. App'x 57, 59 (2d Cir. 2011) (claims omitted from complaint are unpreserved for summary judgment or on appeal).

*Second*, as noted above (and as the Court found), the 2004 Notice is a nullity. By serving the 1981 Notice on EMI pursuant to Section 304(c), thereby securing "a substantial $100,000 bonus payment," Appellants exhausted their right to terminate the 1951 Agreement pursuant to Section 304 of the Act. (SPA.24-25.) Thus, they were not entitled to "a second bite at the termination apple" and could not terminate the 1951 Agreement again in 2004 by virtue of a Section 304(d) notice. (*See id.*)

Appellants desperately try to circumvent 304(d)'s prohibition of a second exercise of the termination right. They argue that it was somehow error for the Court to hold that Coots had exhausted his right to terminate the 1951 Agreement in serving the 1981 Notice because it held also that the 1981 Notice did not terminate the 1951 Agreement (because it was never recorded and never became effective). (Opening Br. at 49-50.)

The Court did not err. That is exactly what the statue provides. Appellants deliberately confuse the *exercise* of the termination right with *effecting* termination. Section 304(d) precludes a second shot at termination where a right under 304(c)

49

has previously been *exercised.* It does not require that the exercise of the 304(c) right of termination have become *effective.*[24] Exercise of the 304(c) termination right is accomplished by service of the termination notice on the grantee. To become *effective*, the notice of termination must be recorded with the Copyright Office before the "effective date of the termination" specified in the notice (17 U.S.C. §304(c)(4)(A)).

Appellants' contention would also make nonsense of the three limitations contained in 304(d): (1) the 304(c) termination right was not previously exercised; (2) the 304(c) termination right expired before 1998; and (3) it is applicable only to grants "executed before January 1, 1978." (17 U.S.C. §304(d).) If, as Appellants suggest, a 304(c) termination had to be *"effective"* rather than *"exercised"* to bar a second termination under 304(d), such limitation would be entirely superfluous. Because 304(d) only applies to grants executed prior to January 1, 1978, it already bars termination of every agreement entered into after a 304(c) termination becomes effective because every such agreement, by definition, is a post-January 1, 1978 agreement (because the 304(c) termination right did not exist until January 1, 1978). *Jaggernauth v. United States AG*, 432 F.3d 1346, 1354 (11th Cir. 2005)

---

[24] The purpose of the termination right afforded by Section 304 is fulfilled where the author or his heirs use the threat of termination to secure an improved deal for the extended renewal term. (*See* SPA.25 ("After obtaining that improved deal with the same grantee, Plaintiffs had no further need nor right to terminate the 1951 Agreement.").)

("courts must give effect, if possible, to every clause and every word of a statute")
(citations omitted).

Moreover, there is no rational reason why Congress would permit those who exercised 304(c) termination rights and obtained an improved deal with the original grantee without the termination becoming effective – such as Appellants did here – to have a second termination right while denying a second termination right to those who did exactly the same thing but recorded the Notice. It is the exercise (or even the threat of exercise) that creates the leverage for an improved deal, not whether the termination becomes effective. Congress used the term *"exercised"* advisedly. *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) ("courts should disfavor interpretations of statutes that render language superfluous."); *Lowery v. Alabama Power Co.*, 483 F.3d 1184, 1204 (11th Cir. 2007) ("we must construe the statute to give effect, if possible, to every word and clause.") (citations omitted); *Tasini v. New York Times Co.*, 206 F.3d 161, 167 (2d Cir. 1999), *aff'd*, 533 U.S. 483 (2001) (applying canon of construction to 1976 Act).

Section 304's intended purpose is fulfilled where the author or his heirs use the threat of termination to secure an improved deal for the extended renewal term. Here, Appellants' 304(c) Notice served that intended statutory purpose, *viz.*, it resulted in the 1981 Agreement whereby Appellants were paid $100,000 for the

grant of the extended renewal term rights. *See Milne*, 430 F.3d 1036 (when heir chose to leverage imminent vesting of termination right to revoke pre-1978 grant and enter into a highly remunerative new grant, it was tantamount to following the statutory formalities, and achieved the exact policy objectives for which § 304(c) was enacted).

As the Court recognized: Appellants' "ability to 'wield the threat of termination' to secure a better deal is exactly what Congress intended. After obtaining that improved deal with the same grantee, [Appellants] had no further need nor right to terminate the 1951 Agreement." (*See* SPA.25 (Order at 25, internal citations omitted).)

## II.

## APPELLANTS CANNOT TERMINATE THEIR OWN GRANTS IN THE 1981 AGREEMENT.

Appellants move beyond the Court's decision, presuming, optimistically, that the 1951 Agreement conveniently disappears. They then suggest "the only remaining question is one of timing." (Opening Br. at 51.) They omit a step. They ignore their own grant in the 1981 Agreement and that Section 203 permits only termination of grants made by an author, not by his heirs.

The Court did not reach this issue because it found that the 1951 Agreement had never been and could not be terminated. However, to the extent such issue were reached, EMI argued below (A.189-190 ¶¶ 26-28) that Appellants have no

right to terminate the 1981 Agreement pursuant to Section 203 because the Section 203 termination right is expressly limited to transfers and licenses granted "*by the author*." 17 U.S.C. § 203(a) (emphasis added).  On page 5 of the 1981 Agreement, Appellants independently  granted to EMI all of [their] rights and interests in and to the United States copyrights in [the Song] for the *extended renewal term thereof*, together with the copyrights for such extended renewal term…"  (A.63.)

Appellants cannot terminate their own grant.  17 U.S.C. § 203(a); *see e.g.*, *Milne,* 430 F.3d at 1042 (where author's son negotiated 1983 grant of rights, author's granddaughter could not terminate 1983 grant under section 203 because it was a grant by her father, the heir, not the author); *see also Steinbeck*, 537 F.3d at 199 (Section 203's termination right "applies only to grants made by the author rather than to grants made by either the author or other parties.").

Appellants argue that grants made by heirs can be terminated under Section 203 where such grant is *also* "executed by the author."  (Opening Br. at 53; *see also* A.25, 32 Compl. ¶¶  50, 98).)  There is nothing to support this argument.  Not a case and not the language of Section 203.  Congress stated that the Section 203 right of termination is "confined to *inter vivos* transfers or licenses executed by the author, and *[does] not apply to transfers by the author's successors in interest or to the author's bequests*."  H.R. Rep. No. 94-1476 at 125 (1976) (emphasis added).  As noted above, the cases are in accord.  Congress knew how to permit termination

of grants made by an author's heirs and did so in Section 304, which provides that grants executed prior to January 1, 1978 are subject to termination if executed by the author or any of the author's successors.  17 U.S.C. § 304(c).[25]

Appellants also claim they are not really parties to the 1981 Agreement because they had nothing to grant at the time.  (Opening Br. at 53.)  But Appellants plainly granted all of their rights in the extended renewal term of copyright in the Song, which term was not to commence until 1990.  (A.63.)  The intention, as confirmed by Coots' attorney, Krasilovsky, was that Appellants would grant such rights "to the extent that any such rights shall be available to them in the future." (A.278.)  As Appellants conceded below, in their opposition to EMI's summary judgment motion, "New York courts in equity have upheld the validity of an assignment of an expectancy right as long as it did not constitute 'and [sic] agreement to the contrary' and as long as it is 'for a valuable consideration.'"  (A.9 (District Court Docket No. 46 at p. 26).)

Appellants do not explain how their own grant in the 1981 Agreement is an "agreement to the contrary."  Courts have routinely held that grants of extended renewal term rights do not constitute "agreements to the contrary."  *See, e.g., Milne,* 430 F.3d  at 1044-46 (new, more lucrative grant of extended renewal term rights

---

[25]  Appellants' argument also elevates form over substance.  If Appellants were correct, separate grants by heirs could be terminated if contained in a document separate from a grant made by an author, but if the former is in the same document as the latter, the heirs grants cannot be terminated.

made by heirs during termination window of prior grant not an "agreement to the contrary…"); *Steinbeck*, 537 F.3d at 202, 203 ("We do not read the phrase 'agreement to the contrary' so broadly that it would include any agreement that has the effect of eliminating a termination right. . . . We cannot see how the 1994 Agreement could be an 'agreement to the contrary' solely because it had the effect of eliminating termination rights that did not yet exist.").  Appellants granted their extended renewal term rights and, contrary to their assertion that they "did not receive consideration," they themselves received consideration for that grant (receiving $100,000 per Paragraph 4(a) and succeeding to the rights to the royalties payable upon the death of their father during the extended renewal term).  (A.62.)[26]

### III.

### <u>THE 2007 NOTICE IS PREMATURE, VOID AND DEFECTIVE.</u>

Finally, assuming Appellants could dispose of the 1951 Agreement and somehow find a way to terminate their own grant in the 1981 Agreement despite the express limitations of Section 203, the earliest that Appellants could terminate EMI's rights (under the 1981 Agreement) would be 2021.

---

[26] An "agreement to the contrary" only exists at all under the termination regime of Sections 304 and 203.  But Appellants contend that the 1981 Agreement "immediately terminated" the 1951 Agreement outside the Act's termination regime.  As such, their "agreement to the contrary" argument as to the 1981 Agreement cannot coexist with their "immediate termination" argument.  *See Milne,* 430 F.3d  at 1046.

Section 203 expressly provides that if a "grant covers *the right of publication* of the work, the [effective termination] period begins at the end of thirty-five years from the date of *publication of the work under the grant* or at the end of forty years from the date of *execution of the grant,* whichever term ends earlier." 17 U.S.C. §203(a)(3) (emphases added).

As clearly appears on the face of the 1981 Agreement, and as both Ms. Baldwin and Mr. Krasilovsky admitted, the 1981 Agreement was intended to provide EMI with the right to publish the song commencing upon the effective date of termination of the 1951 Agreement (in 1990). (A.59-62.) Forty years from the date of the execution of the 1981 Agreement is 2021; thirty-five years from the first publication under the 1981 Agreement, in 1990, is 2025. The earlier of these two dates is 2021. The 2007 Notice is thus a nullity as it is premature. This is why Appellants served the 2012 Notice, which lists 2021 as the effective date.

## CONCLUSION

The Court correctly granted summary judgment in EMI's favor by reference to a limited number of undisputed and indisputable facts and documents applied to the two clear termination sections of the Act. Appellants offer no valid reason to overturn that decision. Their arguments ignore the plain language of the 1981 Agreement, applicable law and the plain terms of Sections 304 and 203 of the Copyright Act.

The 1951 Agreement was never terminated and in accordance with Section 304(c)(6)(F) it cannot be terminated and as such EMI's rights continue for the full duration of US copyright until 2029. The decision should be affirmed in its entirety.

Dated:    New York, New York
        August 7, 2014

PRYOR CASHMAN LLP


By:   */s/ Donald S. Zakarin*
      Donald S. Zakarin
      dzakarin@pryorcashman.com
      Frank P. Scibilia
      fscibilia@pryorcashman.com
      Ross M. Bagley
      rbagley@pryorcashman.com
7 Times Square
New York, New York 10036-6569
(212) 421-4100

*Attorneys for Defendant-Appellee*
*EMI Feist Catalog, Inc.*

57

## <u>CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)</u>

1.      This brief complies with the type volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,698 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font.

Dated: New York, New York
        August 7, 2014                    PRYOR CASHMAN LLP


                                         By:  */s/ Donald S. Zakarin,*
                                             Donald S. Zakarin
                                             dzakarin@pryorcashman.com
                                             Frank P. Scibilia
                                             fscibilia@pryorcashman.com
                                             Ross M. Bagley
                                             rbagley@pryorcashman.com
                                         7 Times Square
                                         New York, New York 10036-6569
                                         (212) 421-4100
                                         *Attorneys for Defendant-Appellee*
                                         *EMI Feist Catalog, Inc.*