14-182-cv
*Baldwin v. EMI Feist Catalog, Inc.*

1 **UNITED STATES COURT OF APPEALS**
2 **FOR THE SECOND CIRCUIT**
3
4 August Term 2014
5
6 (Argued: December 11, 2014     Decided: October 8, 2015)
7
8 No. 14-182-cv
9
10 ————————————————————
11
12 GLORIA COOTS BALDWIN, PATRICIA BERGDAHL, CHRISTINE PALMITESSA,
13
14 *Plaintiffs-Appellants,*
15
16 -v.-
17
18 EMI FEIST CATALOG, INC.,
19
20 *Defendant-Appellee.*
21
22 ————————————————————
23
24 Before:     POOLER, LIVINGSTON, and DRONEY, *Circuit Judges.*
25
26     Plaintiffs appeal from a December 17, 2013 judgment of the United States
27 District Court for the Southern District of New York (Scheindlin, *J.*) in favor of
28 defendant EMI Feist Catalog, Inc. ("EMI").  The district court granted summary
29 judgment to EMI on plaintiffs' claim seeking a declaration that either of two
30 copyright termination notices served on EMI in 2007 and 2012 will terminate
31 EMI's rights in the musical composition "Santa Claus Is Comin' to Town."  On
32 appeal, plaintiffs argue that the district court erred in holding that EMI owns its
33 rights under a 1951 grant that plaintiffs are powerless to terminate, and argue
34 instead that EMI owns its rights under a 1981 grant that will be terminated by

1

either the 2007 or 2012 termination notice. We agree with plaintiffs that EMI owns its rights under the 1981 grant, and conclude that the 2007 termination notice will terminate the 1981 grant in 2016. We therefore reverse the district court's judgment and remand for the entry of a declaratory judgment in plaintiffs' favor.

REVERSED AND REMANDED.

THOMAS K. LANDRY, Carey Rodriguez O'Keefe Milian Gonya, LLP, Washington, DC, *for Plaintiffs-Appellants*.

DONALD S. ZAKARIN (Frank P. Scibilia, Ross M. Bagley, *on the brief*), Pryor Cashman LLP, New York, NY, *for Defendant-Appellee*.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

This appeal involves a dispute over the copyright in the musical composition "Santa Claus is Comin' to Town" (the "Song"), a classic Christmas song written by J. Fred Coots and Haven Gillespie in the 1930s. In 1976, Congress enacted a complex statutory regime that—as we explain later in this opinion—gave authors and their statutory heirs the right to terminate previously made grants of copyright under certain circumstances, and thereby to recapture some of the value associated with the authors' works. *See* 17 U.S.C. §§ 203, 304(c). Plaintiffs-appellants Gloria Coots Baldwin, Patricia Bergdahl, and Christine Palmitessa ("Plaintiffs") represent Coots's statutory heirs; since 2004,

1    they have attempted to navigate this legal thicket and terminate rights in the

2    Song held by defendant-appellee EMI Feist Catalog, Inc. ("EMI") under the terms

3    of certain grants made by Coots to EMI's predecessors.  Plaintiffs brought this

4    lawsuit in the United States District Court for the Southern District of New York,

5    seeking a declaration that either a notice of termination served on EMI in 2007

6    (the "2007 Termination Notice") or another such notice served in 2012 (the "2012

7    Termination Notice") will, upon becoming effective, terminate EMI's rights in the

8    Song.

9           The district court (Scheindlin, *J.*) granted summary judgment to EMI,

10   holding that its rights in the Song will subsist through the entire remaining

11   copyright term—which, under current law, is scheduled to expire in 2029—

12   pursuant to a 1951 agreement (the "1951 Agreement") that Plaintiffs are

13   powerless to terminate.  We reverse.  For the reasons set forth below, we

14   conclude (1) that EMI owns its rights in the Song not under the 1951 Agreement

15   but instead under a subsequent contract executed in 1981 (the "1981

16   Agreement"), and (2) that the 2007 Termination Notice will terminate the 1981

17   Agreement in 2016.  Plaintiffs are, accordingly, entitled to a declaratory judgment

18   in their favor.

3

# BACKGROUND

2    Coots and Gillespie sold the Song and "the right to secure copyright

3    therein" to EMI's predecessor Leo Feist, Inc. ("Feist") in an agreement dated

4    September 5, 1934 (the "1934 Agreement").  J.A. 40.  In the 1934 Agreement, Feist

5    agreed to "publish [the Song] in saleable form . . . within one (1) year," and to

6    pay Coots and Gillespie certain royalties generated by the Song.    J.A. 41.  On

7    September 27, 1934, Feist registered its copyright in the Song with the Copyright

8    Office.

9    At the time, the Copyright Act of 1909 (the "1909 Act"), Pub. L. No. 60-349,

10   35 Stat. 1075, was in effect.   Under the 1909 Act, authors were entitled to

11   copyright in their work for an initial twenty-eight-year period beginning on the

12   date the work was published.  They then had the right to renew their copyright

13   for an additional twenty-eight-year "renewal term," a right that they could

14   exercise even if they had granted their rights in the initial copyright term to a

15   publisher.  Thus, "[t]he renewal term permit[ted] the author, originally in a poor

16   bargaining position, to renegotiate the terms of the grant once the value of the

17   work ha[d] been tested."  *Stewart v. Abend*, 495 U.S. 207, 218-19 (1990); *see also*

18   *Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193, 197 (2d Cir. 2008).  But authors

4

1  could (and often did) grant their rights in the renewal term to publishers before

2  the initial copyright term expired, and in *Fred Fisher Music Co. v. M. Witmark &*

3  *Sons*, the Supreme Court held that these grants were enforceable.  318 U.S. 643,

4  657 (1943).  Unless the author died before the renewal term began—in which case

5  his renewal rights vested in his statutory heirs, notwithstanding his assignment

6  of an expectancy in those rights, *see Miller Music Corp. v. Charles N. Daniels, Inc.*,

7  362 U.S. 373, 376 (1960)—a grant of renewal rights ensured that the publisher

8  would own the copyright for the entire fifty-six-year period provided by the 1909

9  Act.  *See Steinbeck*, 537 F.3d at 197; *Marvel Characters, Inc. v. Simon*, 310 F.3d 280,

10  284 (2d Cir. 2002).

11       While many authors sold their rights in the initial term and the renewal

12  term simultaneously, Coots granted his renewal rights separately, in the 1951

13  Agreement.  The 1951 Agreement assigned to Feist a number of "musical

14  compositions" by Coots, including the Song, "and all renewals and extensions of

15  all copyrights therein," in exchange for certain royalties to be paid "during all

16  renewal periods of the United States copyright in each of said compositions."

17  J.A. 46.  Feist renewed its copyright in the Song on September 27, 1961, at which

1    point its rights were set to expire fifty-six years after copyright was originally

2    registered—i.e., on September 27, 1990.

3        In 1976, Congress enacted a major overhaul of U.S. copyright law (the

4    "1976 Act"), Pub. L. No. 94-553, 90 Stat. 2541, several aspects of which are central

5    to this appeal.  For works created on or after January 1, 1978, the 1976 Act did

6    away with the 1909 Act's dual-term structure, replacing it with a single copyright

7    term lasting for the life of the author plus fifty years.  *See id.* § 302(a).  By contrast,

8    for works created before January 1, 1978, the 1976 Act retained the 1909 Act's

9    dual-term structure, *see id.* § 304(a), (b), and for works (like the Song) already in

10   their renewal term, it extended the renewal term to "seventy-five years from the

11   date copyright was originally secured."  *Id.* § 304(b).  After the passage of the

12   1976 Act, the rights in the Song that Coots had granted to Feist were scheduled to

13   expire in 2009.[1]

14       Although the 1976 Act extended copyright protection for works already in

15   their renewal term, it contained a mechanism for giving authors and their

16   families, as opposed to publishers who had come to own the renewal term rights,

---

[1] Section 305 of the 1976 Act also provided that rights would expire on December 31 of the year they were otherwise scheduled to expire.  Thus, the copyright in the Song was specifically scheduled to expire on December 31, 2009.

6

an opportunity to benefit from the extended term.  *See* 3 Melville B. Nimmer &

David Nimmer, *Nimmer on Copyright* § 11.05[B][1] (2013) [hereinafter "Nimmer"].

To this end, § 304(c) of the statute permitted authors—or, if the author had died,

certain statutory heirs designated in § 304(c)(2)—to terminate "the exclusive or

nonexclusive grant of a transfer or license of the renewal copyright . . . executed

before January 1, 1978."  17 U.S.C. § 304(c).  Because the parties' dispute

implicates the intricacies of this section, we quote the relevant portions at length:

> (3) Termination of the grant may be effected at any time during a period of five years beginning at the end of fifty-six years from the date copyright was originally secured, or beginning on January 1, 1978, whichever is later.

> (4) The termination shall be effected by serving an advance notice in writing upon the grantee or the grantee's successor in title. . . .

>> (A) The notice shall state the effective date of the termination, which shall fall within the five-year period specified by clause (3) of this subsection, . . . and the notice shall be served not less than two or more than ten years before that date.  A copy of the notice shall be recorded in the Copyright Office before the effective date of termination, as a condition to its taking effect.

>> (B) The notice shall comply, in form, content, and manner of service, with requirements that the Register of Copyrights shall prescribe by regulation.

> (5) Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant.

7

(6) . . . In the case of a grant executed by one or more of the authors of the work, all of a particular author's rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to that author or, if that author is dead, to [his statutory heirs]. In all cases the reversion of rights is subject to the following limitations:

. . .

(B) The future rights that will revert upon termination of the grant become vested on the date the notice of termination has been served as provided by clause (4) of this subsection.

. . .

(D) A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination. As an exception, however, an agreement for such a further grant may be made between the author . . . and the original grantee or such grantee's successor in title, after the notice of termination has been served as provided by clause (4) of this subsection.

. . .

(F) Unless and until termination is effected under this subsection, the grant, if it does not provide otherwise, continues in effect for the remainder of the extended renewal term.

17 U.S.C. § 304(c).

In addition to this § 304(c) termination right for pre-1978 grants, the 1976 Act granted authors (or their statutory heirs) the right to terminate grants "executed by the author on or after January 1, 1978." 17 U.S.C. § 203. This § 203

8

1   termination right can be exercised during a five-year period "beginning at the

2   end of thirty-five years from the date of execution of the grant," but if the grant

3   "covers the right of publication of the work," that five-year period begins at the

4   earlier of (1) thirty-five years from the work's publication or (2) forty years from

5   the execution of the grant.  *Id.* § 203(a)(3).  As with termination under § 304(c),

6   termination under § 203 "may be effected notwithstanding any agreement to the

7   contrary."  *Id.* § 203(a)(5).

8          Under the first of the termination provisions just described, § 304(c), the

9   1951 Agreement was, as a pre-1978 grant, subject to termination starting on

10  September 27, 1990, so Coots could serve a termination notice as early as ten

11  years before that date.  17 U.S.C. § 304(c)(3), (4).  Between service of the notice

12  and the date of termination, he could reach an agreement for a further grant of

13  the terminated rights with Feist or its successor in title, but no one else.  *Id.*

14  § 304(c)(6)(D).  In fact, on September 24, 1981, Coots served on Feist's successor,

15  Robbins Music Corporation ("Robbins"), a termination notice naming October

16  23, 1990, as the termination date for the 1951 Agreement (the "1981 Termination

17  Notice").  Coots's attorney, William Krasilovsky, sent a copy of the 1981

18  Termination Notice to the Register of Copyrights on November 25, 1981.  He then

9

set about negotiating with Robbins on Coots's behalf, culminating in the 1981

Agreement, which was signed on December 15, 1981.

The 1981 Agreement recited that Coots (the "Grantor") had transferred his

rights in the Song's renewal term to Feist in the 1951 Agreement; that Feist had

renewed the copyright; that Congress had extended the renewal term in the 1976

Act; and that "the parties hereto desire to insure that [Robbins (the "Grantee")]

shall, for the balance of the period of copyright [in the Song], be possessed of all

United States copyright interest therein." J.A. 59. Coots agreed as follows:

> Grantor hereby sells, assigns, grants, transfers and sets over to
> Grantee . . . all rights and interests whatsoever now or hereafter
> known or existing, heretofore or at any time or times hereafter
> acquired or possessed by Grantor in and to [the Song and various
> derivative works], under any and all renewals and extensions of all
> copyrights therein and all United States reversionary and
> termination interests in copyright now in existence or expectant,
> including all rights reverted, reverting or to revert to Grantor[,] his
> heirs, executors, administrators or next of kin by reason of the
> termination of any transfers or licenses covering any extended
> renewal term of copyright pursuant to Section 304 of the Copyright
> Act of 1976, together with all renewals and extensions thereof.

J.A. 59–60. Further, he made a series of representations, including that he had

served on Robbins "and recorded in the Copyright Office" a termination notice,

which, the parties agreed:

> shall for the purposes of this agreement and Section 304(c)(6)(D) of
> the Copyright Act of 1976 be deemed to have been served upon

10

1   Grantee, in advance of any further grant of rights hereunder, and
2   shall be deemed to take effect at the earliest date possible under the
3   Copyright Act of 1976 and the regulations prescribed by the Register
4   of Copyrights.

5   J.A. 60.

6   Robbins agreed to pay both a $100,000 "non-recoupable bonus" to Coots's

7   children in annual installments from 1981 to 1995, and royalties "as specified in

8   the [1951 Agreement]" for "the period of the Extended Renewal Term of

9   Copyright," a phrase that the 1981 Agreement did not define.  J.A. 62.  Coots's

10  four children—Clayton Coots, Gloria Coots Baldwin, Patricia Coots Chester, and

11  John Coots, Jr.—also signed the 1981 Agreement.  "As an inducement to

12  [Robbins] to enter into the . . . agreement," they assigned to Robbins all of their

13  rights and interests in the Song "for the extended renewal term thereof."  J.A. 63.

14  On May 26, 1982, Krasilovsky received a letter from the Copyright Office

15  stating: "Pursuant to our telephone conversation of March 1, 1982, we are

16  returning" the 1981 Termination Notice "to you unrecorded."  J.A. 69.  There is

17  no explanation for this decision either in the letter or elsewhere in the record.  At

18  his deposition in this case, Krasilovsky could not recall why the notice was

19  returned or what had transpired in the "telephone conversation" mentioned in

20  the letter.  **[A455.]**  The parties agree that the 1981 Termination Notice was never

11

1 actually recorded, although EMI claims it was not aware of the non-recordation

2 of the notice until 2011.

3    As noted, when the 1981 Agreement was signed, the copyright in the Song

4 was scheduled to subsist until December 31, 2009, the end of the year seventy-

5 five years after copyright was initially secured. *See supra* note 1. The parties

6 therefore did not anticipate that § 203 termination—which is available only

7 against grants executed after January 1, 1978 and lasting longer than thirty-five

8 years—would be available against the 1981 Agreement, which they thought

9 would come to an end in 2009, less than thirty-five years later. Things changed

10 in 1998, however, when Congress passed the Sonny Bono Copyright Term

11 Extension Act (the "1998 Act"), Pub. L. No. 105-298, 112 Stat. 2827. For

12 copyrights still in their renewal term at that time, the 1998 Act extended the

13 renewal term to last "95 years from the date copyright was originally secured."

14 17 U.S.C. § 304(b). Because the Song's copyright was secured in 1934, its

15 copyright was now set to expire on December 31, 2029.

16    The 1998 Act also added a new termination right to allow authors and their

17 heirs to extract value from the new twenty-year extension of the renewal term.

18 For copyrights still in their renewal term, authors (or their statutory heirs) could

1   effect termination in the same general way as under § 304(c) if "the termination

2   right provided in [§ 304(c)] has expired by such date" and "the author or owner

3   of the termination right has not previously exercised such termination right."  17

4   U.S.C. § 304(d).  Termination pursuant to § 304(d) can "be effected at any time

5   during a period of 5 years beginning at the end of 75 years from the date

6   copyright was originally secured," *id.* § 304(d)(2)—in the Song's case, starting on

7   September 27, 2009.

8       The possibilities created by the 1998 Act led to a flurry of activity by

9   Coots's statutory heirs,[2] who sought to take advantage of the termination rights

10  that Congress had afforded, but were forced to contend with uncertainty

11  stemming from the fact that the 1981 Termination Notice was never recorded.   In

12  2004, Coots's heirs served on EMI (Robbins's successor) and recorded in the

13  Copyright  Office  a  § 304(d)  termination  notice  with  an  effective  date  of

14  September  27,  2009  (the  "2004  Termination  Notice").   Evidently,  the  2004

---

[2] Coots passed away in 1985.  EMI does not argue that any of the termination notices mentioned in the text fails for the reason that the individuals who served it did not together own a sufficient percentage of Coots's termination interest.  *See generally* 17 U.S.C.  §§ 203(a)(2), 304(c)(2) (specifying the statutory heirs who own an author's termination interest upon his death).  For brevity's sake, therefore, we will avoid explaining who served each termination notice and why they owned a sufficient percentage of Coots's termination interest.

1     Termination Notice was based on the related premises that EMI still owned its

2     rights under the 1951 Agreement (a pre-1978 grant), and that Coots had not

3     already exercised his § 304(c) termination rights.  Under the impression that the

4     1981 Agreement was operative, EMI personnel were confused by the 2004

5     Termination Notice; they ran a search for a prior § 304(c) termination notice,

6     which came up empty.  EMI prepared a draft affidavit to "refute" the 2004

7     Termination Notice, but this was never sent.  Instead, in 2006, EMI began

8     negotiating with Krasilovsky, who was now representing Coots's heirs.

9         EMI and Krasilovsky agreed that in light of the 1981 Agreement, EMI's

10    rights in the Song were more appropriately terminated under § 203.

11    Accordingly, in early 2007, Coots's statutory heirs served and recorded the 2007

12    Termination Notice, which indicated that the 1981 Agreement would terminate

13    pursuant to § 203 on December 15, 2016.  Krasilovsky then began negotiating to

14    sell the to-be-terminated rights back to EMI.  EMI offered Coots's statutory heirs

15    $2.75 million for those rights, an offer that was rejected as insufficient.  At that

16    point, EMI's efforts to acquire the rights appear to have stalled.

17        Two years later, in 2009, Warner-Chappell Music, which had been acting as

18    copyright administrator for a Coots family venture called Toy Town Toons,

14

1    wrote to EMI claiming the copyright in the Song under the 2004 Termination

2    Notice—apparently having returned to the position that termination of the 1951

3    Agreement had never taken place.  EMI responded to this letter through outside

4    counsel, asserting that its copyright "has not been and cannot be terminated" and

5    would expire in 2029.  J.A. 84.  EMI claimed that § 304(d) termination was

6    unavailable because Coots had already exercised his § 304(c) termination right in

7    the 1981 Agreement, and that § 304(d) "does not provide a second right to

8    terminate where the right of termination has already been exercised."  J.A. 85.

9         In 2012, Coots's statutory heirs served and recorded the 2012 Termination

10   Notice.  **[A88–89.]**  Like the 2007 Termination Notice, the 2012 Termination Notice

11   cited § 203, not § 304(d), as the source of the heirs' right to terminate the 1981

12   Agreement.  But "in an abundance of caution," Appellants' Br. at 23, the 2012

13   Termination Notice assumed that the 2007 Termination Notice was premature, on

14   the theory (which Coots's statutory heirs anticipated EMI might advance) that

15   the 1981 Agreement was a grant "cover[ing] the right of publication of the work,"

16   17 U.S.C. § 203(a)(3), and that the "publication" of the Song under the 1981

17   Agreement, which resulted in EMI's owning the nineteen years' worth of rights

18   spanning from 1990 to 2009, took place in 1990.  On that potentially available

15

1    theory, the 1981 Agreement could not be terminated until December 15, 2021 —

2    i.e., forty years after the agreement's execution.  *See id.* ("[I]f the grant covers the

3    right of publication of the work, the [five-year] period [during which termination

4    is available] begins at the end of thirty-five years from the date of publication of

5    the work under the grant or at the end of forty years from the date of execution

6    of the grant, whichever term ends earlier.").

7         On December 16, 2011, Plaintiffs sued EMI in the United States District

8    Court for the Southern District of Florida, seeking a declaration that the 2004

9    Termination Notice had terminated EMI's rights in the Song on December 31,

10   2009, or, alternatively, that the 2007 Termination Notice would terminate EMI's

11   rights on December 15, 2016.  The Florida court granted EMI's motion to dismiss

12   for lack of personal jurisdiction, and Plaintiffs brought this action in the Southern

13   District of New York on December 21, 2012.  Plaintiffs now seek a declaration

14   that the 2007 Termination Notice will terminate EMI's rights on December 15,

15   2016, or, alternatively, that the 2012 Termination Notice will terminate EMI's

16   rights on December 16, 2021.

17        Following discovery, the parties cross-moved for summary judgment.  On

18   December 16, 2013, the district court granted EMI's motion and denied Plaintiffs',

1    holding that since the 1981 Termination Notice was never recorded, EMI owns its

2    rights in the Song under the 1951 Agreement—which, as a pre-1978 grant, is not

3    terminable under § 203.  *Baldwin v. EMI Feist Catalog, Inc.*, 989 F. Supp. 2d 344,

4    352–55 (S.D.N.Y. 2013).  Although Plaintiffs had not specifically argued that the

5    2004 Termination Notice terminated the 1951 Agreement in 2009 under § 304(d),

6    the district court rejected any such argument, concluding that § 304(d) was

7    unavailable because "Plaintiffs exercised their Section 304(c) termination rights

8    when they served the 1981 Notice on EMI and secured a substantial $100,000

9    bonus payment."  *Id.* at 355.  Accordingly, the district court concluded that EMI's

10   rights would survive until 2029.  Judgment was entered on December 17, 2013,

11   and Plaintiffs timely appealed.

12                                    **DISCUSSION**

13        We review a district court's grant of summary judgment de novo.  *Back v.*

14   *Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004).

15   Summary judgment is appropriate when, viewing the evidence in the light most

16   favorable to the non-moving party, *see Nabisco, Inc. v. Warner-Lambert Co.*, 220

17   F.3d 43, 45 (2d Cir. 2000), "there is no genuine dispute as to any material fact and

18   the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).  A

17

1  fact is material if it "might affect the outcome of the suit under the governing

2  law," and a dispute is genuine if "the evidence is such that a reasonable jury

3  could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*,

4  477 U.S. 242, 248 (1986).

5                                    **I.**

6       The first question we must address is whether EMI owns its rights in the

7  Song under the 1951 Agreement or, instead, under the 1981 Agreement.[3]  The

8  2007 Termination Notice and the 2012 Termination Notice purported to terminate

9  EMI's rights pursuant to 17 U.S.C. § 203, but § 203 termination rights are not

10  available against pre-1978 grants.  *See* 17 U.S.C. § 203(a).  Accordingly, if the 1951

11  Agreement is the source of EMI's rights, Plaintiffs cannot terminate those rights

12  under § 203.   Plaintiffs argue that the 1981 Agreement superseded the 1951

13  Agreement and, upon doing so, became the operative source of EMI's rights.

14  EMI responds that the 1981 Agreement did not supersede the 1951 Agreement,

15  and that Coots's failure to record the 1981 Termination Notice means that the

16  1951 Agreement was never terminated and therefore remains in effect.

---

[3] For simplicity's sake, we refer to EMI, Feist, and Robbins collectively as "EMI" throughout the remainder of the opinion.

18

1        **A.**

2        Some preliminary discussion is necessary to understand the parties'

3    dispute fully.   As noted, § 304(c)(6)(D) provides that "[a] further grant, or

4    agreement to make a further grant, of any right covered by a terminated grant is

5    valid only if it is made after the effective date of the termination.   As an

6    exception, however, an agreement for such a further grant may be made between

7    the author [or his statutory heirs] and the original grantee . . . after the notice of

8    termination has been served as provided by" § 304(c)(4).   We will refer to the

9    exception permitting pre-termination, post-notice agreements with the original

10    grantee as the "existing-grantee exception."   This existing-grantee exception was

11    included in the 1976 Act to give the grantee "some advantage over others in

12    obtaining the terminated rights."   3 Nimmer § 11.08[A]; *see Milne ex rel. Coyne v.*

13    *Stephen Slesinger, Inc.*, 430 F.3d 1036, 1047–48 (9th Cir. 2005); *Bourne Co. v. MPL*

14    *Commc'ns, Inc.*, 675 F. Supp. 859, 864–67 (S.D.N.Y. 1987).

15        When an author or his statutory heirs serves a termination notice, the

16    grantee's previously undivided copyright interest is effectively split into three

17    pieces, one owned by the author or his statutory heirs and two owned by the

18    grantee.   The author (or his statutory heirs) holds a future interest in the

1    copyright.  *See* 17 U.S.C. § 304(c)(6) (providing that the "rights under this title

2    that were covered by the terminated grant revert, upon the effective date of

3    termination, to th[e] author" or his statutory heirs); *Mills Music, Inc. v. Snyder*, 469

4    U.S. 153, 162 (1985) (labeling the post-termination interest a "reversion").  *See*

5    *generally* Restatement (Third) of Prop.: Wills & Donative Transfers § 25.1 (Am.

6    Law Inst. 2011) ("A future interest is an ownership interest in property that does

7    not currently entitle the owner to possession or enjoyment of the property.").

8    This future interest, however (unlike an author's renewal right under the 1909

9    Act), "become[s] vested on the date the notice of termination has been served,"

10   17 U.S.C. § 304(c)(6); *see Range Road Music, Inc. v. Music Sales Corp.*, 76 F. Supp. 2d

11   375, 381 (S.D.N.Y. 1999), which gives the grantee confidence, in negotiations

12   under the existing-grantee exception, that the grantor actually has something to

13   convey.  *Compare* 3 Nimmer § 11.08[A] (if the grantor dies after signing a new

14   agreement but before the termination date, "the original grantee is entitled to

15   claim the benefit of the further grant of the terminated rights" because "the

16   termination interest vested upon service"), *with Miller Music*, 362 U.S. at 378

17   (noting that under the 1909 Act, "assignees of renewal rights [took] the risk that

18   the rights acquired [would] never vest in their assignors").

1      Although an author's (or his statutory heirs') interest vests immediately

2  upon service of a termination notice, it becomes possessory—i.e., it entitles the

3  author (or his statutory heirs) to ownership of the copyright—only if the notice is

4  recorded before the termination date. *See* 17 U.S.C. § 304(c)(4)(A) ("A copy of the

5  notice shall be recorded in the Copyright Office before the effective date of

6  termination, as a condition to its taking effect.").  In other words, even after a

7  notice is served, the interest that vests upon service may be *di*vested if the notice

8  is not recorded, and the grantee will continue to own the copyright through the

9  end of the extended renewal term.  *See id.* § 304(c)(6)(F) ("Unless and until

10  termination is effected under this subsection, the grant, if it does not provide

11  otherwise, continues in effect for the remainder of the extended renewal term.");

12  3 Nimmer § 11.06[B] ("Recordation . . . is not a condition precedent to vesting,

13  but a failure to record prior to the effective date of termination constitutes failure

14  to satisfy a condition subsequent, and therefore results in invalidation.").  So

15  upon being served with a termination notice, the grantee—by virtue of the

16  existing grant—holds both a present interest scheduled to terminate on the

17  notice's effective date and a contingent future interest that will vest on that date

18  and entitle the grantee to possession if the notice goes unrecorded.  (In common

1   law property terms, these two interests are analogous to a term of years and a

2   contingent remainder, respectively.  *See, e.g.*, Jesse Dukeminier et al., *Property* 274

3   (7th ed. 2010)).

4        With this background in mind, in the prototypical agreement

5   contemplated by the existing-grantee exception, the author or his statutory heirs

6   convey only the future interest that vested in them upon service of the

7   termination notice—that is, the only interest they hold at the time the notice is

8   served.  In effect, EMI claims that the 1981 Agreement is such a prototypical

9   agreement, and that Coots conveyed to EMI *only* the vested future interest

10  scheduled to revert to him upon termination.  From this premise, EMI argues

11  that the 1951 Agreement remained in place as the source of EMI's *other* two

12  interests in the Song—i.e., the present interest that would have terminated in

13  1990 had the notice been recorded and the future interest contingent on the non-

14  recordation of the 1981 Termination Notice.  When the notice's effective date

15  passed without its being recorded, EMI urges, EMI's contingent future interest

16  vested and entitled it to ownership of the Song's copyright.  Accordingly, on

17  EMI's view that that contingent interest arises from the 1951 Agreement, which

1    remains in place, it claims that it currently owns the Song's copyright under the

2    1951 Agreement.  We disagree.

3                                           **B.**

4          The 1981 Agreement not only granted EMI the future interest scheduled to

5    revert to Coots upon termination, it also replaced the 1951 Agreement as the

6    source of EMI's existing rights in the Song.  "[W]here the parties have clearly

7    expressed or manifested their intention that a subsequent agreement supersede

8    or substitute for an old agreement, the subsequent agreement extinguishes the

9    old one."  *Northville Indus. Corp. v. Fort Neck Oil Terminals Corp.*, 474 N.Y.S.2d 122,

10   125 (App. Div. 1984).[4]  The question is simply whether the parties intended for

11   the new contract to substitute for the old one, and that intention, if otherwise

12   clear, need not be articulated explicitly in the new agreement.  *See Moers v. Moers*,

13   128 N.E. 202, 203 (N.Y. 1920) (indicating that a new contract may discharge prior

14   obligations "expressly or through implication"); *Sheehy v. Andreotti*, 605 N.Y.S.2d

15   257, 259 (App. Div. 1993) (asking whether the new contract, "as a matter of

16   intention, expressed or implied, was a substitution for the prior agreement"); 29

17   Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 73:36 (4th

---

[4] The 1981 Agreement contains a New York choice-of-law clause **[A63]**, and the parties do not dispute that New York law applies.  *See Steinbeck*, 537 F.3d at 200 n.4.

23

1  ed. 1993) ("[T]he intent of the parties that the new agreement is to abrogate the

2  former contract" can be "determined either expressly or by implication from the

3  new contract's provisions . . . ."); 13 Margaret N. Kniffin, *Corbin on Contracts*

4  § 71.1 (Joseph M. Perillo ed., rev. ed. 1998) ("The question is wholly one of

5  intention, to be determined by the usual process of interpretation, implication,

6  and construction, gleaned from the expression of the parties.").

7        The parties to the 1981 Agreement "clearly . . . manifested" an intention to

8  replace the 1951 Agreement and not merely to convey to EMI Coots's future

9  interest in the nineteen-year statutory renewal term extension.   The relevant

10  language is contained in § 1 of the 1981 Agreement, which reads as follows:

11        *Grantor hereby sells, assigns, grants, transfers and sets over to Grantee . . .*
12        [1] *all rights and interests* whatsoever now or hereafter known or
13        existing, *heretofore* or at any time or times hereafter *acquired or*
14        *possessed by Grantor in and to [the Song] . . . under any and all renewals*
15        *and extensions of all copyrights therein and* [2] all United States
16        reversionary and termination interests in copyright now in existence
17        or expectant, including all rights reverted, reverting or to revert to
18        Grantor . . . by reason of the termination of any transfers or licenses
19        covering any extended renewal term of copyright pursuant to
20        Section 304 of the Copyright Act of 1976, together with all renewals
21        and extensions thereof.

22  J.A. 59–60 (emphasis added).  It is quite clear from the first half of the quoted

23  language that Coots was granting more than the vested future interest scheduled

24  to revert to him or his statutory heirs upon termination; he was also granting "all

24

1   rights and interests . . . heretofore . . . acquired or possessed by [him] . . . under

2   any and all renewals and extensions."  Ignoring the bedrock principle that "[a]

3   contract 'should be read to give effect to all its provisions,'" *God's Battalion of*

4   *Prayer Pentecostal Church, Inc. v. Miele Assocs., LLP*, 845 N.E.2d 1265, 1267 (N.Y.

5   2006) (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63

6   (1995)), EMI makes no effort to explain why EMI and Coots would have included

7   the first half of § 1 had they not meant for it to have some effect.  But to give any

8   effect to this language at all, we must read it as replacing the 1951 Agreement,

9   creating a new conveyance of all of Coots's interest in the copyright at once, and

10  not merely as a piecemeal conveyance of his reversionary interest.  Put simply, it

11  would make no sense to have two grants of the same exact rights be operative at

12  the same time; if the first half of § 1 were not meant to replace the 1951

13  agreement, there would be no reason for the parties to have included it.

14      EMI's arguments to the contrary do not persuade us to ignore the first half

15  of § 1.  Relying on our decision in *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d

16  193, EMI points out that the 1981 Agreement does not explicitly rescind the 1951

17  Agreement or contain other language indicating a desire to replace that earlier

18  contract.  In *Steinbeck*, we observed that "parties to an agreement can mutually

25

1    agree to terminate it by expressly assenting to its rescission while simultaneously

2    entering into a new agreement dealing with the same subject matter." *Id.* at 200

3    (quoting *Jones v. Trice*, 608 N.Y.S.2d 688, 688 (App. Div. 1994)).  Relying on that

4    principle, we held that an author or his legatee may, under the existing-grantee

5    exception, rescind an earlier grant of copyright and enter into a new contract

6    conveying rights in the same work to the same grantee.[5]  *See id.* at 200–04; *accord*

_____

[5] *Steinbeck* authorized a "[r]escission and [r]e-grant" scenario, 3 Nimmer § 11.07[E][2][b][iv], pursuant to which Elaine Steinbeck, the owner of the copyright in John Steinbeck's books, entered into a 1994 agreement re-granting rights to works originally granted in 1938.  This scenario resulted in the author's statutory heirs losing their § 304 termination rights, because a post-1978 grant replaced a pre-1978 grant.  *See Steinbeck*, 537 F.3d at 200.  While Elaine Steinbeck owned the relevant copyrights, she shared the statutory § 304 termination rights with Steinbeck's sons from another marriage, and these separate parties never formed the majority necessary to terminate the 1934 grant under § 304(c).  Thus, in *Steinbeck*, no § 304 termination notice was ever served.  *Steinbeck* has been criticized for, in effect, permitting legatees to divest statutory heirs of their § 304 termination rights via contract, notwithstanding § 304(c)(5)'s admonition that termination "may be effected notwithstanding any agreement to the contrary."  *See* 3 Nimmer § 11.07[E][2][b][iv] (noting that a rescission and re-grant "extinguishes the children's right to terminate based on conduct of their adversary").

Although we hold that the 1981 Agreement replaced the 1951 Agreement as the source of EMI's rights, this case neither implicates Nimmer's criticism nor conflicts with § 304(c)(5).  Coots himself (as opposed to a legatee) executed the 1981 Agreement after serving a termination notice on EMI, and because Coots at that time owned both the statutory right to exercise termination and the post-termination interest that vested upon service of the notice, *see* 17 U.S.C. § 304(c)(1), (6)(B), no one else's termination rights were affected when Coots and EMI replaced the 1951 Agreement with the 1981 Agreement.  Because the 1981 Agreement did not cause anyone else to lose termination rights that they otherwise could have exercised, it cannot be a forbidden "agreement to the contrary."  *See* 3 Nimmer § 11.07[E][1] (defining an "agreement to the contrary" as any agreement that "results in the practical inability to terminate the grant of copyright

26

1  *Milne*, 430 F.3d at 1042–48.  As we have already explained, however, an intention

2  to enter into a substitute contract may be express or implied.  *See DC Comics v.*

3  *Pac. Pictures Corp.*, 545 F. App'x 678, 680 (9th Cir. 2013) (unpublished) (holding

4  that under New York law, a 1992 copyright grant superseded a 1938 grant to the

5  same grantee even though the latter agreement "d[id] not, in express terms,

6  cancel the 1938 agreement"); 17B C.J.S. *Contracts* § 597 (noting that a contract

7  replaces a previous one concerning the same subject matter if the "subsequent

8  contract either explicitly rescinds the earlier instrument[] *or* deals with the subject

9  matter . . . so comprehensively as to be complete within itself.") (emphasis

10  added).  By granting EMI the same rights that it already owned under the 1951

11  Agreement *in addition* to the new interest that vested in Coots upon service of the

12  1981 Termination Notice, the 1981 Agreement made it sufficiently clear that the

13  parties intended to replace the earlier contract.

14        EMI cites the Ninth Circuit's decision in *Classic Media, Inc. v. Mewborn*, 532

15  F.3d 978 (9th Cir. 2008), for the proposition that a grant of already-granted rights

16  does not replace the prior grant.  *Mewborn*, however, is readily distinguishable.

17  There, the defendant argued that a 1978 grant from the plaintiff—the daughter of

interest in a given work . . . under circumstances in which, but for the agreement, the
ability to terminate would otherwise exist").

1    Eric Knight, who wrote "Lassie Come Home"—superseded a 1976 grant between

2    the same parties, so that the plaintiff could not exercise § 304(c) termination

3    rights against the earlier grant.  The court disagreed, holding that although the

4    1978 grant purported to convey certain movie, TV, and radio rights to the

5    defendant, the 1976 grant had already conveyed the same exact rights, so the

6    conveyance of those rights in the 1978 grant was "a nullity."  *Id.* at 986.  In other

7    words, the plaintiff's mere conveyance of the same rights twice did not show that

8    the later grant superseded the earlier one.  In *Mewborn*, however, the 1978 grant

9    (1) conveyed ancillary rights that had not been conveyed by the 1976 grant, (2)

10   stated that the plaintiff was conveying all of the rights mentioned in the grant

11   only "to the extent such rights [were] owned by [her]," and (3) expressly

12   provided that those rights were being conveyed "in addition to the rights

13   granted . . . under and pursuant to" the 1976 grant.  *Id.* at 981.  Those three

14   provisions, read together, unmistakably signaled the parties' intention for the

15   later contract to coexist alongside the earlier one, rather than replace it.  No

16   similar intention is evident from the 1981 Agreement's terms.

17        Next, EMI points to § 3(a) of the 1981 Agreement, in which Coots

18   represented that he had served and recorded the 1981 Termination Notice, and in

28

1    which the parties agreed that the notice "shall for the purposes of this agreement

2    and Section 304(c)(6)(D) of the Copyright Act of 1976 be deemed to have been

3    served upon Grantee, in advance of any further grant of rights hereunder, and

4    shall be deemed to take effect at the earliest date possible under the Copyright

5    Act of 1976."  J.A. 60.  Under the 1976 Act, the "earliest date possible" on which

6    the 1981 Termination Notice could have taken effect was in 1990, so EMI argues

7    that § 3(a) reflects the parties' belief that the 1951 Agreement would continue in

8    effect until 1990: if the parties thought that the 1981 Agreement would replace

9    the 1951 Agreement of its own force, why should it matter whether or when the

10    1981 Termination Notice took effect?

11        EMI's argument, however, ignores the fact that the 1981 Termination

12    Notice had already been served and (the parties thought at the time) recorded in

13    the Copyright Office.  That fact distinguishes this case from others in which an

14    earlier grant was rescinded and replaced without the author's (or his statutory

15    heirs') ever serving a termination notice, *see Steinbeck*, 537 F.3d at 202; *Milne*, 430

16    F.3d at 1040, and explains why the parties here clarified in § 1 of the 1981

17    Agreement that Coots's conveyance to EMI included "all United States

18    reversionary and termination interests . . . including all rights reverted, reverting

29

1    or to revert to Grantor . . . by reason of the termination."  J.A. 60.  Absent this

2    assignment to EMI of Coots's future interest in the Song, it would not have been

3    the least bit clear that the mere replacement of the 1951 Agreement by the 1981

4    Agreement would mean that the future interest that had *already vested* in Coots

5    upon serving the 1981 Termination Notice would not, in fact, entitle him to

6    ownership of the Song's copyright on the notice's effective date.  *See* Benjamin

7    Melniker & Harvey D. Melniker, *Termination of Transfers and Licenses Under the*

8    *New Copyright Law*, 22 N.Y.L. Sch. L. Rev. 589, 604–05 (1977) (noting uncertainty

9    regarding whether a termination notice would result in the termination of the

10   grantee's rights if the to-be-terminated grant were replaced between service of

11   the notice and its effective date).  Given this uncertainty, it was sensible for the

12   1981 Agreement to make unmistakably clear that EMI would receive whatever

13   rights would revert to Coots on the 1981 Termination Notice's effective date

14   notwithstanding the replacement of the 1951 Agreement.  *See, e.g.*, *In re SRC*

15   *Holding Corp.*, 545 F.3d 661, 670 (8th Cir. 2008) ("Nothing prevents the parties

16   from using a 'belt and suspenders' approach in drafting . . . in order to be

17   'doubly sure.'").

30

1    EMI points to one more provision of the 1981 Agreement: § 4(b), in which

2    EMI agreed to pay royalties "as specified in the [1951 Agreement]" for "the

3    period of the Extended Renewal Term of Copyright."  J.A. 62.  The district court

4    reasoned that the "Extended Renewal Term of Copyright" began only in 1990,

5    and thus that if the 1981 Agreement had replaced the 1951 Agreement

6    immediately, Coots would not be entitled to any royalties from 1981 to 1990.  *See*

7    *Baldwin*, 989 F. Supp. 2d at 354.  But the 1981 Agreement does not define the

8    phrase "Extended Renewal Term of Copyright."  Although often used to refer

9    only to the nineteen-year extension added by the 1976 Act, *see, e.g.*, *Woods v.*

10   *Bourne Co.*, 60 F.3d 978, 981, 982 (2d Cir. 1995), the phrase can naturally be

11   understood to refer to the entire renewal term *as extended* by the 1976 Act.  In fact,

12   the statute itself arguably uses the phrase in this latter sense.  *See* 17 U.S.C.

13   § 304(c)(6)(F) ("Unless and until termination is effected under this subsection, the

14   grant . . . continues in effect for the *remainder* of the extended renewal term.")

15   (emphasis added).  Accordingly, § 4(b) easily can be read to require EMI to pay

16   royalties for however much of the renewal term—as extended—was still

17   remaining after the contract was signed.  In light of this plausible alternative

31

1    reading, we do not think § 4(b) should move us to ignore the first half of § 1 of

2    the 1981 Agreement, as EMI would have us do.

3           Finally, the district court relied on extrinsic evidence purportedly showing

4    that the parties intended for EMI to receive only the future interest that vested in

5    Coots upon service of the termination notice.[6]    Consideration of extrinsic

6    evidence is only permissible where the contract at issue is ambiguous; because

7    we believe the 1981 Agreement is clear, resort to such evidence was

8    inappropriate here.  *See Rainbow v. Swisher*, 527 N.E.2d 258, 259 (N.Y. 1988).  In

9    any event, while the record is certainly replete with indications that the parties

10   believed EMI would be receiving only nineteen years' worth of rights, we assign

11   little significance to this evidence for the simple reason that (at the time) EMI *was*

12   only acquiring nineteen years' worth of rights.  There is no dispute that before

13   the 1981 Agreement was executed, EMI owned Coots's renewal rights under the

14   1951 Agreement, and that absent the 1981 Agreement—assuming Coots recorded

15   the 1981 Termination Notice—EMI's rights would terminate in 1990.  After the

16   1981 Agreement was signed, its rights were (until the passage of the 1998 Act)

17   scheduled to survive until 2009.  But the undisputed *ends* of the 1981 Agreement

---

[6] This evidence included Baldwin's deposition testimony, as well as a 1981 letter
from Krasilovsky to John Coots, Jr.  *See Baldwin*, 989 F. Supp. 2d at 355.

1 say little about the *means* the parties employed to achieve them.  Section 1 of the

2 contract shows that they chose not only to have EMI receive the future interest

3 that vested in Coots upon service of the termination notice, but also to replace

4 the 1951 Agreement as the source of EMI's existing rights in the Song.

5              \* \* \*

6    Under the correct understanding of the 1981 Agreement, Coots's failure to

7 record the 1981 Termination Notice is irrelevant to the question whether EMI

8 presently owns the copyright in the Song under the 1951 Agreement or under the

9 1981 Agreement.  Whether EMI owns the Song's copyright by virtue of owning

10 Coots's rights in the renewal term *qua* the renewal term, or instead by virtue of

11 owning the post-termination interest conveyed back to it in the 1981 Agreement,

12 its rights in the renewal term are traceable to the 1981 Agreement—not the 1951

13 Agreement—either way.   And for deciding whether plaintiffs' termination

14 notices pursuant to § 203 are valid, that is all that matters.  Accordingly, we need

15 not decide whether an unrecorded termination notice can serve to terminate a

16 prior grant where the parties have reached an agreement under the existing-

17 grantee exception.

1          **II.**

2          Our conclusion that the 1981 Agreement—a post-1978 agreement—is the

3     source of EMI's rights in the Song means that Plaintiffs can terminate the 1981

4     Agreement under § 203.  Because the 1951 Agreement is not operative, we need

5     not address the district court's holding that Plaintiffs could not terminate the

6     1951 Agreement because Coots had "exercised" his § 304(c) termination rights by

7     serving a termination notice and then "secur[ing] a substantial $100,000 bonus

8     payment." *Baldwin*, 989 F. Supp. 2d at 355.  The only remaining question, then, is

9     whether the 1981 Agreement will be terminated by the 2007 Termination Notice

10    or, instead, by the 2012 Termination Notice.  We conclude that the 2007

11    Termination Notice will terminate the 1981 Agreement in 2016.

12         As noted, termination under § 203 is available for grants "executed by the

13    author on or after January 1, 1978."  17 U.S.C. § 203(a).  Where the author is dead,

14    termination may be effected by individuals holding more than half of the

15    author's termination interest as set forth in the statute.  *Id.* § 203(a)(1), (2).

16    Ordinarily, these individuals may effect termination "at any time during a period

17    of five years beginning at the end of thirty-five years from the date of execution

18    of the grant."  *Id.* § 203(a)(3).  In this case, that period would begin in 2016.  But

1  "if the grant covers the right of publication of the work," an alternative

2  calculation method applies: termination may be effected in the five-year period

3  beginning "thirty-five years from the date of publication of the work under the

4  grant or . . . forty years from the date of execution of the grant, whichever term

5  ends earlier." *Id.* A termination notice may be served between two and ten years

6  before the termination date. *Id.* § 203(a)(4)(A). The notice must "state the

7  effective date of the termination," be recorded in the Copyright Office "as a

8  condition to its taking effect," and comply with various other formalities

9  prescribed by regulation. *Id.* § 203(a)(4); *see* 37 C.F.R. § 201.10.

10  EMI does not dispute that the 1981 Agreement was executed after January

11  1, 1978, that Plaintiffs own a sufficient percentage of Coots's termination interest,

12  or that the 2007 Termination Notice complies with all of the necessary statutory

13  and regulatory formalities. EMI does, however, advance two arguments in

14  support of its position that the 2007 Termination Notice will not terminate the

15  1981 Agreement in 2016. Neither argument is persuasive.

16  First, EMI argues that § 203 termination is unavailable to Plaintiffs because

17  Coots's children signed the 1981 Agreement, which was therefore not "executed

18  by the author." This argument is meritless. As a factual matter, the 1981

35

1    Agreement plainly *was* executed by the author—namely, Coots—and specifically

2    identified him alone as the "Grantor," who was "exclusively and solely

3    possessed of any and all termination interests arising under Section 304." J.A. 59,

4    61.  As a legal matter, moreover, the Coots children who signed the 1981

5    Agreement did not have any interest in the Song that they could have conveyed

6    in 1981, because Coots was still alive; the future interest that vested upon service

7    of the 1981 Termination Notice therefore vested solely in him.  *See* 17 U.S.C.

8    § 203(a)(1), (b)(2).  Accordingly, while the 1981 Agreement purported to result in

9    the transfer to EMI of all of the Coots children's "rights and interests" in the

10   Song, J.A. 63, the only rights that the Coots children conceivably could have

11   transferred at the time were the termination rights that they were scheduled to

12   inherit by operation of the statute upon Coots's death.  *See* 17 U.S.C. § 203(a)(2).

13   Those rights, however, cannot be contracted away.  *See id.* § 203(a)(5)

14   ("Termination of the grant may be effected notwithstanding any agreement to

15   the contrary . . . .").

16        EMI's second argument that the 2007 Termination Notice will not

17   terminate the 1981 Agreement is based on the premise that the 1981 Agreement

18   "covers the right to publication" of the Song.  In EMI's view, the publication of

36

1   the Song under the 1981 Agreement occurred in 1990, since "the 1981 Agreement

2   was intended to provide EMI with the right to publish the song commencing

3   upon the effective date of termination of the 1951 Agreement (in 1990)."

4   Appellee's Br. 56.  Under the alternative calculation method for grants that cover

5   the right of publication, EMI argues, the earliest the 1981 Agreement can be

6   terminated is 2021—i.e., forty years after it was executed.  We disagree.

7   　　At the start, our conclusion that the 1981 Agreement became the operative

8   source of EMI's rights immediately upon its execution suggests that even if

9   EMI's premise that the 1981 Agreement "covers the right to publication" were

10  sound, publication would have occurred under that agreement in 1981.  Thus,

11  even the alternative calculation method that EMI prefers would yield an earliest-

12  possible termination date of 2016.  Regardless, EMI's premise is incorrect.  As

13  relevant here, the statute defines "publication" as "the distribution of copies or

14  phonorecords of a work to the public by sale or other transfer of ownership, or

15  by rental, lease, or lending."  17 U.S.C. § 101.  As § 203 itself suggests, the

16  publication of a work is a one-time event.  *See id.* § 203(a)(3) (referring to "the

17  date of publication"); *see also Marvel Characters, Inc.*, 310 F.3d at 282–83 (noting

18  that under the 1909 Act, "an author was entitled to a copyright in his work for

37

1   twenty-eight years from the date of its publication"); 1 Nimmer § 4.01[A] (listing

2   the consequences that still attach to a work's publication date under the 1976

3   Act).   In other words, publication happens when the work is *first* sold or

4   otherwise distributed to the public.   EMI does not claim, nor could it, that the

5   Song was not made available to the public until 1990; in the original 1934

6   Agreement, EMI's predecessor Feist agreed to "publish [the Song] in saleable

7   form" within one year.   J.A. 41.   As a result, it was the 1934 Agreement, and not

8   the 1981 Agreement, that covered the right to publication of the Song.

9        The history of the alternative calculation method confirms that it does not

10  apply here.   This statutory provision was "added at the behest of book

11  publishers, who argued that a straight period of thirty-five years from execution

12  of the grant could give them a shorter time to exploit a work, insofar as

13  publication contracts are often signed before the work is written, such that years

14  may elapse before it is completed and published."   3 Nimmer § 11.05[A][2].

15  While EMI is correct that an analogous period will generally elapse between the

16  execution of an agreement under the existing-grantee exception and the start of

17  the renewal term extension that the agreement is meant to cover, the problem

18  EMI identifies arose solely from the 1998 Act's further extension of the renewal

1    term by twenty years.  The Congress that passed the 1976 Act would not have

2    expected § 203 termination to be available against new grants made under

3    § 304(c)(6)(D)'s existing-grantee exception—which, at the time, could be executed

4    a maximum of twenty-nine years before their expiration (i.e., the ten-year period

5    between execution of the new grant and termination of the old grant, plus the

6    nineteen-year period covered by the new one), less than the thirty-five years

7    required by § 203.  It is clear, then, that the timing issue that allegedly

8    disadvantages EMI in this case is not addressed by the alternative calculation

9    method for grants "cover[ing] the right of publication."  We are not at liberty to

10    fill that apparent lacuna by giving the term "publication" in § 203(a)(3) a

11    meaning that it does not bear.

12        In sum: EMI does not dispute that the 1981 Agreement was executed on

13    December 15, 1981.  Because that grant was "executed by the author" and does

14    not "cover the right of publication," it is terminable under § 203 starting on

15    December 15, 2016—which is the effective date of termination stated in the 2007

16    Termination Notice.  Accordingly, we conclude that the 2007 Termination Notice

17    will terminate the 1981 Agreement on that date.

1                                  **CONCLUSION**

2          We have considered EMI's remaining arguments and find them to be

3   without merit.  For the reasons set forth above, the judgment of the district court

4   is **REVERSED**, and this case is **REMANDED** for the entry of a declaratory

5   judgment in Plaintiffs' favor.